COURT OF APPEALS OF VIRGINIA


Present:    Judges Kelsey, Haley and Petty
Argued by teleconference


JERRY LEMONE BLOW, SR.
                                                        OPINION BY
v.      Record No. 1644-07-2                    JUDGE WILLIAM G. PETTY
                                                        AUGUST 19, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Walter W. Stout, III, Judge

Karen L. Stallard, Supervising Appellate Defender (Office of the
Public Defender, on brief), for appellant.

Karri B. Atwood, Assistant Attorney General (Robert F. McDonnell,
Attorney General, on brief), for appellee.


Following a bench trial, appellant, Jerry Lemone Blow, Sr., was convicted of unlawful

wounding of a law enforcement officer, in violation of Code § 18.2-51.1, and the malicious

wounding of his daughter, in violation of Code § 18.2-51.[1]  On appeal, Blow presents two

challenges to his convictions.  First, he argues that the evidence was insufficient to warrant a

conviction for the unlawful wounding of a police officer.  Second, he argues the trial court erred by

applying the doctrine of transferred intent in finding him guilty of the malicious wounding of his

daughter.  As discussed below, we affirm his convictions.

I. BACKGROUND

On appeal, we "view the evidence in the light most favorable to the Commonwealth, the

party prevailing below, and grant all reasonable inferences fairly deducible therefrom."  Clifton

---

[1] Blow was also convicted of eluding a law enforcement officer in violation of Code
§ 46.2-817(B) and the malicious wounding of his wife in violation of Code § 18.2-51.  He does not
challenge these convictions on appeal.

v. Commonwealth, 22 Va. App. 178, 180, 468 S.E.2d 155, 156 (1996) (citing Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and citation omitted). We present the facts below with that standard in mind.

On the morning of November 26, 2007, Blow and his wife had an argument in the living room of their home. Eventually, the argument escalated and Blow attacked his wife with a kitchen knife, stabbing her several times. The couple's daughter was also in the room during the attack. While Blow was "standing over" his prone wife and stabbing her, his daughter ran up behind Blow and "jumped on his back and . . . tried to grab the knife." As a result, Blow cut his daughter's hand with the knife. The daughter "yelled out, 'Daddy, I cut my hand. Daddy, I cut my hand.'" [2] At that point, Blow stopped stabbing his wife, took some money out of her pocketbook, and left the house.

After Blow's departure, his daughter went to the neighbor's house and asked them to call the police. As part of their response, the police issued a broadcast for officers to be on the look out for Blow and his green Saturn car. Later that morning, Officer John Dean of the Richmond police observed the green Saturn, activated the siren and lights of his marked police car, and followed Blow as he was pulling onto Interstate 64. However, instead of pulling over, Blow fled from the officer.

Thus began a chase through the City of Richmond and Henrico County that lasted for 28 miles on Interstates 64, 95, and 195, as well as other roads. The chase involved a number of police officers in ten patrol cars from the City of Richmond, Henrico County, and the State Police. During

---

[2] At trial the daughter testified that when she tried to grab for the knife she "ended up cutting [her]self."

- 2 -

the chase, Blow performed a number of illegal u-turns, changed lanes erratically, and reached speeds exceeding 100 miles per hour.

Near the end of the chase, State Trooper Adam Kulpa led the pursuit. Eventually, he maneuvered his patrol car in front of the Saturn while traveling about 55 or 60 miles per hour. Kulpa testified that at that time he "noticed the suspect vehicle move at a faster rate than I was going and ran into the back of my vehicle. At this point, I had not decelerated. I was maintaining my speed." The cars "broke contact," and Kulpa took his foot off of the accelerator to help him maintain control of his car. "Then," Kulpa testified, "a brief moment later, I'll estimate 5 to 10 seconds, my vehicle was struck a second time by the suspect vehicle." Blow passed Kulpa's car on the right-hand side and then suddenly swerved to the left, striking the front passenger side of Kulpa's cruiser with the rear driver's side of the Saturn. Blow then lost control of the Saturn, "spun out," and hit the wall on the left side of the highway. Kulpa sustained injuries to his upper back and neck as a result of the collision.

Based upon Trooper Kulpa's testimony and a review of the video recording from Kulpa's car, the trial court concluded that two of the three collisions resulted from deliberate acts on Blow's part:

> In the video [Trooper Kulpa] . . . goes past on the left and gets ahead of [Blow's Saturn]. He is maintaining his position and he is struck in the rear.
>
> He is struck in the rear again, but the Court would not find that that was intentional. The statement was that he was hit. There is a little blurring on the video, but it is not forceful. It doesn't look forceful. The police car maintains control, anyway.
>
> The second hit, the police officer says took 5 to 10 seconds afterwards, but he took his foot off the accelerator and was hit 1 to 2 seconds later. If you're both maintaining speed and he lets his foot off the accelerator, the likely result of that is that you would, he would hit you again. That may not have been Mr. Blow's intent.

He then pulls to the right and passes the car and hits the car from the right-hand side. From the video, the police car did not move out of the lane in watching that, and so your car intentionally struck him twice.

After finding Blow guilty, the court sentenced him to a total of nineteen years incarceration, with fourteen years, six months suspended. This appeal followed.

## II. ANALYSIS

The appellate standard of review for sufficiency of the evidence issues is well established. "'[T]he judgment of the trial court sitting without a jury is entitled to the same weight as a jury verdict.'" Saunders v. Commonwealth, 242 Va. 107, 113, 406 S.E.2d 39, 42 (1991) (quoting Evans v. Commonwealth, 215 Va. 609, 613, 212 S.E.2d 268, 271 (1975)). Thus, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002); see Code § 8.01-680. We are mindful that "great deference must be given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." Walton v. Commonwealth, 255 Va. 422, 426, 497 S.E.2d 869, 871 (1988). Therefore, we do not "substitute our judgment for that of the trier of fact." Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002). Instead, "the relevant question" on appeal "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

### A. Unlawful Wounding of Trooper Kulpa

Both on brief and at oral argument, Blow argues that the evidence was insufficient to show that he had the specific intent to maim, disable, disfigure or kill Trooper Kulpa. Instead, Blow contends, the evidence failed to exclude his proposed reasonable hypothesis of innocence: that he

- 4 -

merely intended to flee from the officers, rather than to injure the trooper. We conclude that the record supports the trial court's finding that Blow had the necessary intent to injure Trooper Kulpa.[3]

Intent may, and usually must, be proved by circumstantial evidence, Servis v. Commonwealth, 6 Va. App. 507, 524, 371 S.E.2d 156, 165 (1988), such as a person's conduct and statements, Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). And Blow is correct that while "[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence[,]" it must "exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). However, as we explained in Haskins v. Commonwealth, 44 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004), whether a defendant's hypothesis of innocence is reasonable is a question of fact and is "subject to deferential appellate review." Where, as here, "the factfinder has rejected the hypothesis *as unreasonable*, that determination cannot be overturned as arbitrary unless no reasonable factfinder would have come to that conclusion." Id. at 12, 602 S.E.2d at 406 (citations omitted) (emphasis in the original).

We find these facts similar to those in Luck v. Commonwealth, 32 Va. App. 827, 531 S.E.2d 41 (2000), where we affirmed a conviction for malicious bodily injury of a police officer. There, the trial court found that Luck had led police on a sixteen-mile, high-speed chase during which he drove dangerously, including "repeatedly steer[ing] his car into police vehicles" and

---

[3] Blow relies on our holding in Haywood v. Commonwealth, 20 Va. App. 562, 567, 458 S.E.2d 606, 607 (1995), reversing a conviction for attempted capital murder of a law enforcement officer when the "evidence failed to exclude [a] reasonable hypothesis" of innocence. That case, however, is inapposite to the case before us for two reasons. First, the intent involved in Haywood was a very narrow one – the specific intent to kill. Here, the Commonwealth was not limited to proving the intent to kill. Instead, it could meet its burden by proof of any one of several specific intents, i.e., the intent to maim, disable or disfigure. Second, in Haywood we specifically noted that there was no evidence "that [Haywood] ever swerved or aimed his truck to hit the police cars." Id. Here, the trial court specifically found that Blow did just that.

accelerating and striking police cruisers from behind when they attempted a "rolling roadblock." Id. at 830, 832-33, 531 S.E.2d at 42-43.

Here, the evidence established that Blow, while attempting to flee, led the officers on a dangerous, high-speed, twenty-eight-mile-long car chase. During this chase, Blow drove recklessly on busy highways, changed lanes erratically, and made illegal u-turns. Despite the lengthy chase, Blow was unable to escape Trooper Kulpa and was about to be forced to a stop. From these facts the trial court could reasonably infer that Blow intended to prevent this from happening by deliberately crashing into Trooper Kulpa's car. This act would "obviously cause a serious wreck, maiming, disfiguring, disabling or killing anyone involved in it." Id. at 833, 531 S.E.2d at 43. Thus, the trial court properly rejected Blow's hypothesis of innocence as unreasonable in light of its amply supported factual finding that Blow intended to injure Trooper Kulpa.

## B. Transferred Intent

Blow also argues that his conviction for the malicious wounding of his daughter must be reversed because the trial court erroneously applied the doctrine of transferred intent in order to find the specific "intent to maim, disfigure, disable or kill" required for a conviction of malicious wounding. Code § 18.2-51. Blow argues that the doctrine of transferred intent does not apply for two reasons. First, he claims that the doctrine is inapplicable on these facts because, he argues, the stabbing of his wife and the cutting of his daughter were two separate and distinct acts. Second, he contends that his conviction for the malicious wounding of his wife eliminated the justification for the doctrine because he did not escape criminal responsibility for his

actions.[4]  For the reasons discussed below, we disagree with Blow and affirm his conviction for the malicious wounding of his daughter.

The doctrine of transferred intent permits a fact finder to transpose a defendant's criminal intent to harm an intended victim to another unintended, but harmed, victim.  It originated in the English common law and has been frequently applied in American criminal cases.  See generally, William L. Prosser, Transferred Intent, 45 Tex. L. Rev. 650 (1966-1967) (hereinafter Prosser); see also Harvey v. State, 681 A.2d 628, 634-37 (Md. Ct. Spec. App. 1996) (discussing the history and development of the doctrine of transferred intent); Wayne R. LaFave, Substantive Criminal Law § 6.4(d) (2d ed. 2003) (hereinafter LaFave).

The policy behind the doctrine of transferred intent is to impose criminal liability on a defendant whose intentional act causes harm to an unintended victim; in other words, the defendant is not absolved of criminal responsibility merely because he has the misfortune to harm a bystander rather than his intended victim as a result of his wrongful act.  See LaFave at § 6.4(d).  Hence, "if an accused attempts to injure one person and an unintended victim is injured because of the act, the accused's intent to injure the intended victim is transferred to the injury of the unintended victim, even though this wounding was accidental or unintentional."  Crawley v. Commonwealth, 25 Va. App. 768, 773, 492 S.E.2d 503, 505 (1997) (citations omitted).  As we examine the trial court's application of this legal principle to the case before us, we are bound by the trial court's factual findings unless they are "plainly wrong" or without evidentiary support; however, we review the trial court's application of the law *de novo*.  Code § 8.01-680; see also McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*).

---

[4] In a footnote, Blow also invites us to "consider whether the doctrine is ever appropriately applied in the case of a stabbing rather than a shooting."  However, he makes no argument nor does he cite any cases to explain why this is anything other than a distinction without a difference.  Accordingly, we decline the invitation.  See Rule 5A:20.

Although Blow suggests in his brief that the doctrine of transferred intent is "tolerated without enthusiasm," it is clear that the doctrine is a viable part of our law. The doctrine has been accepted, discussed, and applied in our Commonwealth in a number of cases. See, e.g., Riddick v. Commonwealth, 226 Va. 244, 308 S.E.2d 117 (1983) (affirming murder conviction on theories of transferred intent and concert of action); Crawley, 25 Va. App. at 768, 492 S.E.2d at 503 (declining to apply doctrine of transferred intent to an inchoate crime); Henderson v. Commonwealth, 17 Va. App. 444, 438 S.E.2d 292 (1993) (affirming murder conviction when the defendant shot and killed one man, believing him to be another); Long, 8 Va. App. 194, 379 S.E.2d 473 (affirming a malicious wounding conviction when the defendant commanded his dog to "kill" one person, but the dog attacked someone else). Thus, the only question before us is the application of the doctrine to the facts of this case.

1.

Initially, Blow argues that the trial court should be reversed because, in his view, his daughter's voluntary attempt to aid her mother, rather than his criminal assault on his wife, caused his daughter's injuries. We disagree.

The evidence shows that Blow created the situation that caused his daughter's injury through his intentional acts: he attacked his wife and stabbed her numerous times with a kitchen knife, while his daughter was present. In this context, it was certainly reasonably foreseeable that his daughter would come to her mother's aid. When his daughter was injured during Blow's on-going attack, that injury was "within the *res gestae* of" his original criminal act. Davis v. Commonwealth, 12 Va. App. 408, 410-11, 404 S.E.2d 377, 378-79 (1991) (discussing the related concept of the felony murder rule).[5] Because his daughter's injury was reasonably related to the

---

[5] See Wilfred J. Ritz, Felony Murder, Transferred Intent, and the Palsgraf Doctrine in the Criminal Law, 16 Wash. & Lee L. Rev. 169, 169 (1959) (discussing the "common origin" and relationship between the felony murder rule and the doctrine of transferred intent).

criminal act Blow directed at his wife, and because Blow had the requisite intent to maim his wife when he cut his daughter, the doctrine of transferred intent applies. "It is fairly clear that when the defendant intends [a criminal act] his intention will be 'transferred' to make him liable for [the unintended crime], *provided that the harm is direct and immediate, i.e. within the scope of the* [*intended crime*]." Prosser at 655 (emphasis added).

Thus, the daughter's injury, which occurred as she attempted to prevent Blow from stabbing her mother again, was a natural and probable consequence of his crime. See Harris v. State, 505 S.E.2d 239, 240-41 (Ga. Ct. App. 1998) (affirming conviction and finding the doctrine of transferred intent applicable when the intended victim's friend intervened in an attack, "hitting and pulling on [the defendant] to make him stop . . ." and "attempting to grab the knife . . . cutting her hand in the process." The Georgia court concluded that "[i]n legal contemplation, the intent follows the act through to its legitimate [i.e. probable] results.").

2.

Blow also argues that transferred intent should not be applied to these facts because "the justifications underlying the doctrine [of transferred intent] are absent." He posits that the basis for "engaging in the fiction of transferred intent" is to prevent a situation where, because of a "lucky accident in killing or injuring the wrong person, a defendant could escape liability for completing an act he intended." Id. (Internal quotation marks omitted). Blow argues that his conviction for the malicious wounding of his wife eliminated the justification for transferring the intent directed toward his wife in order to convert the accidental wounding of his daughter into a similar crime.

We note that the states are split on the application of the doctrine of transferred intent when both the intended victim and the unintended victim are injured. See LaFave at § 6.4(d) n.47 (collecting cases). Some states hold that the doctrine of transferred intent would not apply

on the facts before us. For instance, the Maryland Supreme Court has held that the doctrine of transferred intent "was intended to enable conviction of a defendant of the crime he intended to commit *only when that crime was not committed upon the intended victim*." Ford v. State, 625 A.2d 984, 998 (Md. 1993) (emphasis in original) (citing Gladden v. State, 330 A.2d 176 (Md. 1974)). The Maryland court explained:

> [T]ransferred intent makes a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim. Transferred intent does *not* make two crimes out of one. Where the crime intended has actually been committed against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims.

Id. (emphasis in original); but see Poe v. State, 671 A.2d 501, 504 (Md. 1996) (recognizing an exception to the rule in Ford when "the defendant intends to murder one victim and instead kills an unintended victim" while wounding the intended victim); accord Harvey, 681 A.2d at 644 (reviewing Maryland cases, including Ford and Poe, and concluding that "the fate of the intended victim is immaterial. If the unintended victim is killed, the transferred intent doctrine applies. If the unintended victim is not killed [but is only wounded], the transferred intent doctrine does not apply."); cf. Bell v. State, 768 So.2d 22, 26 (Fla. Dist. Ct. App. 2000) (reversing appellant's conviction for attempted murder based on transferred intent when he only injured the unintended victim); People v. Bland, 48 P.3d 1107, 1110 (Cal. 2002) (following Ford and Poe and applying transferred intent when both victims were killed, but concluding that transferred intent has no application to attempted murder).[6]

---

[6] The case before us does not involve an inchoate crime; instead, Blow stands convicted of two counts of the completed crime of malicious wounding. See Crawley, 25 Va. App. at 773, 492 S.E.2d at 505 (declining to apply the doctrine to an inchoate crime). We also note that the California court "express[ed] no opinion" in Bland "regarding the application of transferred intent to a crime, such as battery, that is not inchoate and does not involve a battery." 48 P.3d at 1119 n.7.

These states, however, remain in the minority. The majority of states apply transferred intent more broadly, allowing the application of the doctrine when any harm comes to an unintended victim as a result of a defendant's volitional act. See LaFave at § 6.4(d) n.47. For example, the Georgia Court of Appeals affirmed a defendant's convictions for two counts of aggravated assault when she intentionally shot one victim during a fight and unintentionally shot a bystander who sought to intervene in the fracas. Fussel v. State, 369 S.E.2d 511, 513 (Ga. Ct. App. 1988). The court explained:

> When an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it.

Id. (citing Cook v. State, 340 S.E.2d 891 (Ga. 1986)) (internal quotation marks and citation omitted).

Similarly, the Supreme Court of South Carolina affirmed a conviction of assault and battery with intent to kill[7] that relied on the doctrine of transferred intent when the intended victim was killed and the unintended victim was injured. State v. Fennell, 531 S.E.2d 512 (S.C. 2000). There, the defendant had an argument with another man, retrieved a gun from his car, and "emptied his gun at" the first victim, killing him. Id. at 514. One of his shots went astray, however, and struck a bystander who survived his injuries. Id. The court concluded that intent is not "in limited supply." Id. at 515. The court explained that "[t]he mental state . . . is not extinguished at the moment a bullet strikes and kills the intended victim, such that there is no mental state left upon which to convict an unintended victim who is also injured or killed." Id.

---

[7] Assault and battery with intent to kill, as defined in S.C. Code Ann. § 16.3-620 (1985), is a felony requiring the *mens rea* of malice aforethought. State v. Fennell, 531 S.E.2d 512, 517 (S.C. 2000).

The South Carolina court decided that the use of transferred intent to convict the appellant of felony assault and battery with intent to kill was appropriate, and concluded:

> A person who, acting with malice, unleashes a deadly force in an attempt to kill or injure an intended victim should anticipate that the law will require him to answer fully for his deeds when that force kills or injures an unintended victim. Accordingly, . . . the doctrine of transferred intent may be used to convict a defendant . . . when [he] kills the intended victim and also injures an unintended victim.

Id. at 517.[8]

Finally, while no Virginia appellate decision has specifically addressed this question, our Supreme Court has suggested that a transferred intent instruction could be appropriate when the appellant killed one victim and wounded another "[w]ith a single shotgun blast." Jones v. Commonwealth, 217 Va. 231, 232, 228 S.E.2d 127, 128 (1976). And this Court stated, albeit in dicta, that "had appellant missed [his intended victim] and shot [an unintended victim], *or shot both* [victims], appellant would have been found guilty of maliciously wounding [his unintended victim], even if he only intended to wound [someone else]." Crawley, 25 Va. App. at 773, 492 S.E.2d 503 at (emphasis added).

Based on our review of the law of both this Commonwealth and other jurisdictions, we do not accept Blow's argument that the "justifications underlying the doctrine [of transferred

---

[8] Other cases discussing transferred intent and applying the majority view include: Ochoa v. State, 981 P.2d 1201, 1205 (Nev. 1999) (determining that transferred intent applies in all crimes where an unintended victim is harmed as a result of defendant's specific intent to harm an intended victim regardless of whether the intended victim is injured); State v. Hinton, 630 A.2d 593 (Conn. 1993) (rejecting defendant's argument that under Connecticut's murder statute, Conn. Gen. Stat. § 53a-54a, the actual killing of the intended victim extinguished the intent so that it could not be transferred to another, unintended victim and applying transferred intent when defendant fired a gun into a group, killing three people and seriously injuring a fourth); State v. Warlock, 569 A.2d 1314 (N.J. 1990) (affirming murder convictions when defendant killed both intended and unintended victims); State v. Stringfield, 608 P.2d 1041 (Kan. Ct. App. 1980) (applying transferred intent to convict defendant of voluntary manslaughter and aggravated battery when the defendant fatally shot the intended victim and wounded an unintended victim).

intent] are absent" in this case. On the contrary, we agree with the reasoning of the majority of states: this is precisely the kind of situation in which transferred intent should, and does, operate. As another of our sister courts has explained: "Human beings are not fungible. Therefore, a separate injury to each constitutes a separate crime, and the law does not give the defendant a discount on the second and subsequent victims of his intentional conduct." State v. Hinton, 630 A.2d 593, 598 (Conn. 1993).

Based on this discussion, we hold that the doctrine of transferred intent is applicable when, as here, the defendant completes his intended crime and, in doing so, injures an unintended victim. Thus, the trial court was correct in concluding that Blow's intent to maim, disfigure, disable or kill his wife was transferred and combined with the injury he caused to his daughter to support his conviction of malicious wounding.

### III. CONCLUSION

Thus, we conclude that the evidence was sufficient to support Blow's convictions, and we affirm.

Affirmed.