Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
Goodwyn, JJ., and Lacy, S.J.

COMMONWEALTH OF VIRGINIA

v.  Record No. 081645    OPINION BY JUSTICE DONALD W. LEMONS
                                   June 4, 2009
MICHAEL RAY FERGUSON, JR.

                FROM THE COURT OF APPEALS OF VIRGINIA


     In this appeal, we consider whether statements made by

Michael Ray Ferguson ("Ferguson") during a custodial

interrogation should have been suppressed because of police

failure to honor his invocation of the right to counsel.

                I.  Facts and Proceedings Below

     On July 27, 2005, Pittsylvania County Deputy Sheriff

Kenneth Glass responded to a report of a residential burglary

and received a description of a vehicle seen leaving the

residence as a "black, small Talon Eagle with blue stripes on

it."  The description of this car was dispatched to the

surrounding jurisdictions for a "be on the lookout."

Subsequently, an officer from the Altavista town police

department in Campbell County stopped a vehicle meeting the

description and driven by Ferguson.  Altavista officers

notified Investigator Jerry A. Hagerman from Pittsylvania

County and Chief Brian Marr from the Town of Hurt in

Pittsylvania County that they had stopped Ferguson.  Both

Hagerman and Marr soon arrived at the scene of the stop.

After conferring with the other officers, Hagerman asked Ferguson to follow him to the Town of Hurt police station.

Ferguson testified that at the station he was put in a conference room along with four police officers.  Ferguson was told that he was being questioned about a breaking and entering, and Hagerman asked for permission to search his car.  Ferguson refused permission.  Hagerman turned on a tape recorder, told Ferguson again he was being questioned about a breaking and entering and asked Ferguson to repeat his answer to the search request, to which Ferguson responded, "Nah, I want a lawyer, you know what I'm saying?"

After Ferguson requested a lawyer, Hagerman read Ferguson his Miranda rights and asked Ferguson if he understood his rights.  Ferguson said he did.  Then Hagerman asked if Ferguson wanted to speak about the offense, to which Ferguson replied, "Uh, My Moma [sic] said that if I get in any more trouble I need a lawyer."  Hagerman immediately responded, "You don't have to talk with me.  Let me talk to you now." Then Hagerman told Ferguson that he had a "positive identification of your car as it was pulling out of that house yesterday," and that he knew the amount of goods stolen. Specifically, Hagerman attempted to get Ferguson to talk to him by saying, "[i]f you want to go ahead and talk to me about this fine, if you don't, you know you're in trouble right now.

2

Uh, I'm not, I'm not playing with you." Hagerman continued asking Ferguson questions such as "[W]here was you at yesterday? . . . Who was with you yesterday? . . . What kind of work do you do?" and asked about Ferguson's source of money.

At 1:32 p.m., Hagerman stated "okay, I am going to let you sit here a for a few minutes. The time is now 1:32 [p.m.]. This concludes the interview." Then he turned off the recorder. After the recorder was turned off, Ferguson testified that Hagerman said, "he would bring the wrath of Hell on [Ferguson]." Marr confirmed that the threat was made and added that Hagerman said "if you ever come back to Pittsylvania County he would put him in jail." Hagerman instructed Marr to remain in the room with Ferguson while he went to obtain a search warrant for Ferguson's car. Marr stated that once Hagerman left the room, he and Ferguson were in the room "waiting on Investigator Hagerman to come back."

Marr knew Ferguson and Ferguson's mother. After sitting silently for "[a] couple minutes" Ferguson testified he said, "I don't want to go to jail." Marr testified that they sat in the room in silence "for several minutes" and then Ferguson said, "I messed up", or "this is messed up."

Once Ferguson and Marr started talking, Ferguson testified that Marr told him to "own up to what [he] did" and

3

to think of his daughter and that Marr "would try to help [him] as much as he could." Marr stated that he and Ferguson "just talked in general" about Ferguson's family and needing a job and that Ferguson "needed to help his self [sic]." Marr conceded that he was trying to get Ferguson to admit to the crime. After Marr and Ferguson spoke, he read Ferguson his Miranda rights again and asked Ferguson if he would prefer speaking with him rather than with Detective Hagerman. Ferguson stated he preferred talking with Marr.

At 2:00 p.m., the tape recorder was turned on again, and Ferguson gave consent for a search of the car. After being read his Miranda rights again, Ferguson "waived" his rights and confessed to the crime of breaking and entering. Ferguson signed an "Advice of Rights" form, which indicates his statement began at 2:04 p.m. and ended at 2:20 p.m. Prior to the second recorded statement, Ferguson had not admitted to the crime.

At trial, Ferguson moved to suppress all statements made after he said "I want a lawyer" as well as the resulting evidence, as violative of his Fifth Amendment right to counsel. Based on its finding that Ferguson had "reinitiated the conversation," the trial court denied the motion. Ferguson entered a conditional guilty plea, preserving his right to appeal the denial of his motion to suppress. Both a

4

panel of the Court of Appeals and the Court of Appeals sitting en banc reversed Ferguson's conviction. Ferguson v. Commonwealth, 51 Va. App. 48, 69, 654 S.E.2d 328, 338 (2007) (panel); 52 Va. App. 324, 329-30, 348, 663 S.E.2d 505, 507-08, 516 (2008) (en banc). We awarded the Commonwealth an appeal.

II. Analysis

On appeal, the Commonwealth concedes that Ferguson properly asserted his right to counsel in a custodial interrogation setting. The Commonwealth assigns error to the judgment of the Court of Appeals as follows:

> 1. The Court of Appeals erred in ruling that Ferguson's confession was not admissible.
>
> 2. The Court of Appeals erred in finding the interrogation never ceased.
>
> 3. The Court of Appeals erred in failing to find that Ferguson reinitiated the dialogue with police, that his subsequent waiver was knowing and voluntary, and that his confession [was] therefore admissible.

As we noted in Zektaw v. Commonwealth, 278 Va. ___, ___, ___ S.E.2d ___, ___ (2009) (this day decided), "[t]he right to have counsel present during a custodial interrogation is an axiom of American law expressed in Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny." In Miranda, the United States Supreme Court established that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474. The United States

5

Supreme Court has further held "that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (footnote omitted). Further,

> the prophylactic protections that the Miranda warnings provide to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self-incrimination," 384 U.S. at 467, are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

Arizona v. Roberson, 486 U.S. 675, 681 (1988).

Even without the concession of the Commonwealth, we have no difficulty holding that Ferguson clearly, unambiguously and unequivocally asserted his right to counsel during a custodial interrogation.  Part of the interrogation was tape-recorded.  Having been placed in a conference room with four police officers, Ferguson was told that he was being questioned about a breaking and entering offense.  He immediately stated "Nah,

6

I want a lawyer, you know what I'm saying?" One cannot imagine a clearer invocation of the right to counsel. But police did not honor this invocation. Instead, Hagerman alternately threatened and attempted to cajole Ferguson into cooperation.

After the invocation of the right to counsel, Hagerman continued to read Miranda rights from a form prompting Ferguson to say, "My Moma [sic] said that if I get in any more trouble I need a lawyer." Undeterred, Hagerman pressed on with the interrogation. "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). Hagerman's statements and the totality of circumstances surrounding this interrogation were clearly "designed to elicit an incriminating response."

Hagerman told Ferguson about the evidence that he had including "positive identification of your car as it was pulling out of that house yesterday." Hagerman's intent to cause Ferguson to change his mind about having a lawyer was clear from his own statements to Ferguson:

> If you're willing to talk.  If you want to go
> ahead and talk to me about this fine, if you
> don't, you know you're in trouble right now. Uh,
> I'm not, I'm not playing with you. . . . The
> only hope you've got right now is to come as
> clean as you can get.

Hagerman continued questioning seeking to have Ferguson incriminate himself.  He asked "Where was you at yesterday" and "who was with you yesterday?"  Hagerman continued questioning by asking Ferguson about the source of his money.  Hagerman turned off the tape recorder, but the threats and coercive techniques continued, all in blatant disregard of Ferguson's invocation of his right to counsel.  According to Marr, after the tape recorder was turned off, Hagerman told Ferguson that "the wrath of Hell is going to come down on you" and "if you ever come back to Pittsylvania County he would put him in jail."

Hagerman stated to Ferguson, "I am going to let you sit here for a few minutes," and directed Marr to stay in the conference room with Ferguson.  Hagerman left to seek the assistance of a Commonwealth's Attorney in obtaining a search warrant for Ferguson's vehicle.  Marr stated that he and Ferguson were "waiting on Investigator Hagerman to come back." According to Marr, they sat in silence alone for "several minutes."  According to Ferguson, they sat in silence for "[a] couple minutes."  The silence was broken when the coercive

environment, the threats, the cajoling, the promises of assistance in return for cooperation, and the failure to honor Ferguson's request for counsel had its intended effect. According to Ferguson, he broke the silence by saying "man I don't want to go to jail." According to Marr, Ferguson said "this is messed up" or "I messed up." Whatever Ferguson said was immediately followed by Marr's further conversation and questioning. Marr read Miranda warnings to Ferguson again and thereafter obtained a confession.

The Commonwealth contends that when Ferguson broke his silence in the very few minutes alone with Marr, he reinitiated communication with police under the rule in Edwards and consequently, further interrogation was permissible. Whatever the significance of Ferguson's comments that broke the silence, they were the product of the coercive interrogation and environment created by police. Surely, police may not use the product of such techniques as proof of a voluntary reinitiation of communication and subsequent waiver of the right to counsel. Even if Ferguson's comments qualified as reinitiation of communication under Edwards,

> where reinterrogation follows, the burden
> remains upon the prosecution to show that
> subsequent events indicated a waiver of the
> Fifth Amendment right to have counsel present
> during the interrogation . . . the question
> would be whether a valid waiver of the right to
> counsel and the right to silence had occurred,

9

> that is, whether the purported waiver was
> knowing and intelligent and found to be so under
> the totality of the circumstances.

Oregon v. Bradshaw, 462 U.S. 1039, 1044-45 (1983) (emphasis and internal quotation marks omitted).  Under the totality of the circumstances, we hold that this encounter was one continuous custodial interrogation conducted in such a manner as to deliberately disregard a clear, unambiguous and unequivocal invocation of the right to counsel and coerce Ferguson to incriminate himself.  The person subject to interrogation does not have to repeat his invocation of the right to counsel – once is enough if it is clear, unambiguous and unequivocal as it is in this case.

## III.  Conclusion

For the reasons stated, we hold that Ferguson's statements should have been suppressed because he clearly, unambiguously, and unequivocally invoked his right to counsel. Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.