# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

   v.

Kelsey Erin Helvenston

December 28, 2010

Case No. (Criminal) CR09-2330

BY JUDGE NORMAN A. THOMAS

This matter came before the Court on October 14, 2010, on the Commonwealth's motion to retain certain statements by Helvenston while detained by the Norfolk Police Department. Both the Commonwealth and the Defense submitted briefs. After considering the arguments, the Court grants the Commonwealth's motion to retain statements made by Defendant at the Police Operations Center outside of the presence of law enforcement officers. Investigators compromised neither Defendant's Fourth nor Fifth Amendment rights.

*Background*

The Commonwealth and Defendant agree on the history of this case. Helvenston accompanied investigators to the Norfolk Police Department's Police Operations Center (POC) at their request on March 22, 2009. She remained at the POC until the next morning. Her time spent at the POC was videotaped. Helvenston was certified as an adult to the Norfolk Circuit Court at a hearing held in the Norfolk Juvenile and Domestic Relations District Court on July 14, 2009.

Helvenston moved to suppress statements made to law enforcement at the POC. After hearing argument on October 20 and 22, and again on November 30, 2009, the Court found that Helvenston invoked her right to remain silent at page 73 of the transcript (DVD # 2 0:0:34.) Although finding that, prior to her invocation, Helvenston voluntarily waived her rights under *Miranda*, the Court found that she was subject to an unlawful arrest and granted her Motion to Suppress on December 17, 2009.[1] On appeal, the Court of Appeals of Virginia reversed the ruling in part, finding that Helvenston was lawfully held in the POC.[2] On October 14, 2010, the parties convened on the Commonwealth's current Motion to Retain Statements Made by Defendant That Were Not in Response to Investigators' Questions.

### Fourth Amendment

The Fourth Amendment protects citizens against unreasonable search and seizure. In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court established the modern test for violations of the Fourth Amendment: whether there has been an intrusion into a legitimate expectation of privacy, one that is both subjectively held and objectively reasonable. An interception of a conversation in which a person has a reasonable expectation of privacy is a "search" for Fourth Amendment purposes. *Id.* at 353. As a general rule, however, suspects in police custody "[have] no reasonable expectation of privacy in areas controlled by the police." *Belmer v. Commonwealth*, 36 Va. App. 448, 459, 553 S.E.2d 123, 128 (2001) (finding no reasonable expectation of privacy regarding a conversation held in a police interrogation room outside the presence of law enforcement officers). Under this general rule, Helvenston has no basis for a claim the video recording of her statements at issue was an intrusion into a reasonable expectation of privacy.

Because Fourth Amendment analysis is necessarily fact-based, there are few absolutes or definitive lines to be drawn. For example, some jurisdictions have found that defendants have held reasonable expectations of privacy in station house interview rooms. *See, e.g., State v. Munn*, 56 S.W.3d 486, 496 (Tenn. 2001) (finding a violation of the Fourth Amendment where "circumstances indicat[ed] that the officers both deceived and assured the defendant and his parents that they were free to talk in private" but secretly videotaped their conversation); *People v. A.W.*, 982 P.2d 842 (Colo. 1999) (finding a reasonable expectation of privacy when the officer made assurances that no one would be listening to the suspect's conversation with

---

[1]    Commonwealth v. Helvenston (2009), 79 Va. Cir. 607. [Reporter's Note]

[2]    Commonwealth v. Helvenston, 2010 Va. App. LEXIS 237 (Va. App. June 14, 2010). [Reporter's Note]

his father); *State v. Calhoun*, 479 So. 2d 241, 243 (Fla. 1985) (finding a clear expectation of privacy in a conversation between defendant and his brother in a jail interview room "because such an expectation was deliberately fostered"). This is because police deliberately set-up the expectation.

This is not an instance where Virginia should recognize an exception to the general rule. There is little or no evidence that Helvenston satisfies even the first prong of the *Katz* test by evincing a subjective expectation of privacy. Several times during the recordings of her confinement in the POC interview room, the viewer can see Helvenston look at the camera, acknowledging its presence. She spoke to the investigators through the door, and it stands to reason that, if she can hear them, they can hear her. Even if Helvenston did evince some subjective expectation of privacy, it is certainly not one society is prepared to recognize as reasonable. Generally, a person in custody has no expectation of privacy because the monitored police interview room shares few, if any, attributes of traditionally private places. *See Belmer*, 36 Va. App. at 457-60. Here, there is no evidence that the police in this case fostered any sort of expectation of privacy. The general rule applies; any expectation of privacy was unreasonable.

Nor would any subjective expectation of privacy rise to the level of reasonable simply because Helvenston was on the phone with her mother when she made certain statements. "[A] defendant has [no] justifiable and constitutionally protected expectation that a person with whom [she] is conversing will not then later reveal the conversation to the police." *United States v. White*, 401 U.S. 745, 749 (1971). Thus, leaving a suspect alone with another individual while in police custody does not itself create a reasonable expectation of privacy. *Belmer*, 36 Va. App. at 461. Under the current circumstances, there was no intrusion into a reasonably held expectation of privacy and therefore no violation of the Fourth Amendment.

*Fifth Amendment*

Investigators did not violate Helvenston's Fifth Amendment rights with respect to the statements now at issue. *Miranda v. Arizona*, 384 U.S. 436, 471-72 (1966), requires that, as "an absolute prerequisite to interrogation," law enforcement officers must inform an individual held for interrogation of her right to consult with counsel and of her right to remain silent. These warnings are required when an individual is in custody and subjected to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). The meaning of "interrogation," as intended in *Miranda*, includes "express questioning and its functional equivalent." *Id.* at 300-01. The term "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. If an accused makes a voluntary statement not in response to an express question

or to the functional equivalent of such, use of that statement is not violative of her Fifth Amendment rights. *See id.* at 302-03; *see also Bradshaw v. Commonwealth,* 228 Va. 484, 490, 323 S.E.2d 567, 570 (1984) (Invocation of *Miranda* rights "does not protect a suspect when he makes a spontaneous admission not induced or initiated by the police."). Certainly, it cannot be said that Helvenston made the statements at instant issue in response to direct questioning. In fact, she was alone in the POC interrogation room when she made them.

To test whether police conduct constitutes the functional equivalent of interrogation, the Court asks "whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response." *Timbers v. Commonwealth,* 28 Va. App. 187, 196 (1998) (quoting *Blain v. Commonwealth,* 7 Va. App. 10, 15 (1988)). However, "the police surely cannot be held accountable for the unforeseeable results of their words or actions." *Innis,* 446 U.S. at 301-02. That police action "strikes a responsive chord" or even rises to the level of "subtle compulsion" does not make the conduct the functional equivalent of interrogation. *See id.* at 303. It is clear from the video recordings on the record that Helvenston was under a great deal of stress while in custody. Her behavior was at times erratic and unpredictable. The investigators cannot be held accountable for Helvenston's unforeseeable behavior and statements. Nothing police said to her induced her to point her hands as if holding a gun and to release the barrage of profane language heard in the videos. Perhaps it is fair to say that her statements were a result of the understandable stress of being confined in a POC interrogation room; being in custody no doubt struck a responsive chord in this young woman. The test, however, is not one of mere cause and effect, and it would set dangerous precedent to say that custody itself amounts to the functional equivalent of interrogation. These were spontaneous and voluntary comments.

Helvenston's position is even weaker regarding statements made to her mother over the telephone on DVD 6. There is absolutely nothing on the record to indicate that police conduct induced her to make any admissions to her mother, let alone make the telephone call. Helvenston seems calmer in that last video. She has given up her constant pacing about the room, she remains seated, and she refrains from tossing her water bottle and pushing around chairs. She stopped yelling and cursing. Helvenston was alone and speaking freely with nothing to indicate any official conduct designed to elicit the conversation or contents thereof.

Additionally, the Court does not find that Helvenston made the statements at issue now as part of a continuous custodial interrogation. In *Ferguson v. Commonwealth,* 278 Va. 118, 677 S.E.2d 45 (2009), the Supreme Court of Virginia found that police conduct can amount to continuous custodial interrogation. There, when police told him he was being questioned for a breaking and entering, Ferguson unequivocally asked

for a lawyer. Police read him *Miranda* warnings, and he again expressed interest in having the aid of counsel. Rather than honoring this request, police alternatively threatened and attempted to cajole Ferguson into cooperating. *Id.* at 124. Eventually, one of the two investigative officers left Ferguson with the other, telling him he could just sit there. The two sat alone in silence for several minutes. The silence was broken when the coercive environment had its intended effect and Ferguson made a statement. *Id.* at 125. Rather than characterizing Ferguson's "voluntary" statements as reinitiated conversation under *Edwards v. Arizona*, 451 U.S. 477 (1981) (An accused can waive his right to have counsel present by initiating further communication, exchanges, or conversations with the police.), the Court characterized them as statements made as part of a continuous custodial interrogation in violation of *Miranda*.

Any ruling based on the totality of the circumstances, like *Ferguson*, necessarily draws its result from the facts at hand. The present facts can be distinguished from those in *Ferguson*. The Court has already ruled that certain statements made in response to interrogation are inadmissible because procured in violation of *Miranda*. The statements the Commonwealth seeks to retain now were not made in the presence of investigators, and they are not spoiled by the previous illegal interrogation. They were not made in response to police prodding or threats as in *Ferguson*. Unlike Ferguson, Helvenston was alone in the POC room when she made the statements at issue. They were not made to break the silence of an uncomfortable stare-down of the like in *Ferguson*. Under the totality of these circumstances, Helvenston's statements were not made as a result of a continuous interrogation but were spontaneous and freely made.

Helvenston, in her brief, points to the officer's comment that she overheard while confined in the interrogation room. She told her mother that she heard an officer say, "[A]ll you have to do is sit in there and tell them that they're going to go to jail for three hours and then they tell you what you want to hear." (Tr. 183, ln. 5-8.) At most this comment can be said to have elicited the admonishment Helvenston gave to her interrogators: "I can hear everything that you're saying and you're talking about me. It hurts my feelings." (Tr. 145, ln. 9-10.) The cartwheels and handstands that followed were not a foreseeable result, nor was the threatening gesture of pointing her fingers as if shooting a gun and saying, "fuck with me, bitch, pow." (Tr. 145, ln. 23-24.) It is difficult to see even a subtle compulsion to engage in gymnastics and threats in response to the police conduct reflected in the record. The Commonwealth is not seeking to introduce the elicited response, rather the statement made without provocation. The statement was no doubt the result of the disturbance and intrusion of being confined in an interrogation room, but the law does not protect Helvenston from this warranted intrusion nor from her own unprovoked voluntary statements. Again, the test in *Timbers* is not one of mere cause and effect.

Furthermore, the statements Helvenston made over the telephone to her mother are sufficiently far removed from any unlawful conduct on the part of investigators so as to remove any residue of taint or contamination from the earlier interrogation. The phone call is made much later. Helvenston is in a different room and alone. The record reflects no evidence that police engaged in any conduct that would be reasonably likely to elicit a response in the form of incriminating admissions to her mother. The police left Helvenston to her own devices when they permitted her to call her mother. She was not provoked. Her voluntary comments were not part of a continuing interrogation. They are admissible.

### Conclusion

In sum, the Commonwealth may retain the statements found on page 145 of the transcript at lines 23-24 (DVD # 3, 1:52:22) as well as on pages 183-190 (DVD # 6 in its entirety). The Court concludes that the video recording of Helvenston did not constitute an unreasonable intrusion into her privacy in violation of the Fourth Amendment. The Court further concludes that the statements were not elicited by custodial interrogation nor made as part of a continuous custodial interrogation as in *Ferguson*. Although the investigators did violate Helvenston's rights by engaging in questioning after she invoked her right to remain silent, her later voluntary statements to seemingly no one in the interrogation room and to her mother over the telephone cannot be characterized as illegally procured by the functional equivalent of interrogation in violation of *Miranda*.

The Court grants the Commonwealth's Motion to Retain Statements Made by Defendant That Were Not in Response to Investigators' Questions.