PETTY, J., with whom KELSEY, McCLANAHAN, and HALEY, JJ.,
join, dissenting.
Because I believe that the police officer’s remarks in this case are no more coercive than the police officers’ discussion in Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), I respectfully dissent from the majority’s holding. While the majority certainly gives due attention to the language in Innis setting forth the meaning of “interrogation,” I believe the majority fails to give proper weight to the holding of Innis on its specific facts. To me, the answer to the question before us is straightforward—if the statements of the officers in Innis did not constitute “interrogation,” neither did the statements of Detective Alston.
At the outset, I do not take issue with the majority’s general discussion of the scope of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, I also remain mindful that:
Suppression of evidence ... has always been our last resort, not our first impulse. The exclusionary rule generates “substantial social costs,” which sometimes include setting *27 the guilty free and the dangerous at large. [The United States Supreme Court has] therefore been “eautio[us] against expanding” it, and “[has] repeatedly emphasized that the rule’s ‘costly toll’ upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application.” [The Court has] rejected “[indiscriminate application” of the rule, and [has] held it to be applicable only “where its remedial objectives are thought most efficaciously served”—that is, “where its deterrence benefits outweigh its ‘substantial social costs.’ ”
Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006) (some alterations in original) (citations omitted).
As the majority notes, the United States Supreme Court has defined “interrogation” for purposes of Miranda as referring “not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Innis, 446 U.S. at 301, 100 S.Ct. at 1689-90 (footnote omitted). In keeping with the Supreme Court’s direction that “[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police,” id., we have previously held that “ ‘the Innis standard ... requires] a determination of whether an objective observer would view an officer’s words or actions as designed to elicit an incriminating response,’ ” Timbers v. Commonwealth, 28 Va.App. 187, 196, 503 S.E.2d 233, 237 (1998) (quoting Blain v. Commonwealth, 7 Va.App. 10, 15, 371 S.E.2d 838, 841 (1988)).
Importantly, however, the Supreme Court in Innis also stated that “subtle compulsion” is not sufficient to constitute “interrogation” as the Court defined that term. Innis, 446 U.S. at 303, 100 S.Ct. at 1691. According to the Court, “subtle compulsion” does not, as a matter of law, rise to the level of “words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.” Id.; see also Arizona v. Mauro, 481 U.S. 520, 529, *28 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458 (1987) (recognizing Innis’ holding that “subtle compulsion” is not interrogation). “Officers do not interrogate a suspect simply by hoping that he will incriminate himself.” Mauro, 481 U.S. at 529, 107 S.Ct. at 1936. Thus, even were we to assume that Detective Alston personally hoped that some sort of “subtle compulsion” would induce Quarles to incriminate himself, the Supreme Court has already told us such behavior is not sufficient to constitute interrogation. When I examine the facts and holding in Innis, I am convinced that whatever subtle compulsion may have been present in this case does not rise to the level of “interrogation.”
In Innis, three police officers accompanied Innis to the police station in a police car after he had been arrested. Innis, 446 U.S. at 294, 100 S.Ct. at 1686. Innis was suspected of having committed murder and robbery with a shotgun. See id. at 293, 295, 100 S.Ct. at 1686-87. Innis did not have a shotgun with him when the police arrested him. See id. at 294, 100 S.Ct. at 1686. The police advised Innis of his Miranda rights, and Innis requested an attorney. Id. On the way to the police station, one of the officers remarked to another officer that because of a school for handicapped children in the vicinity, “there’s a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.” Id. at 294-95, 100 S.Ct. at 1686. The third officer in the car testified that the first officer “said it would be too bad if the little—I believe he said a girl—would pick up the gun, maybe kill herself.” Id. at 295, 100 S.Ct. at 1687. The conversation did not stop there—the second officer was conversing with the first officer, agreeing “that it was a safety factor and that we should, you know, continue to search for the weapon and try to find it.” Id.
Upon hearing this exchange, Innis interrupted the officers’ dialogue and asked them to take him back so he could show them where the gun was. Id. Once they arrived back at the arrest scene, Innis was again advised of his Miranda rights, but he stated that he “wanted to get the gun out of the way *29 because of the kids in the area in the school.” Id. Innis then led the police to where the gun was hidden. Id.
On these facts, the Supreme Court held that the behavior of the police officers in the car with Innis did not constitute interrogation. Id. at 302-08, 100 S.Ct. at 1690-91. Although the Rhode Island Supreme Court had held that the officers’ behavior was interrogation, since it constituted “subtle coercion” or “subtle compulsion,” id. at 296, 303, 100 S.Ct. at 1687, 1691, the United States Supreme Court said that “subtle compulsion” is not sufficient to constitute “interrogation” for purposes of Miranda, id. at 303, 100 S.Ct. at 1691. An analysis of the Court’s reasoning on the facts in Innis leads me to conclude that the facts in the present case are no closer to “interrogation” than the facts in Innis were.
In Innis, the Court noted that there was no “express questioning” of the defendant, and that the police officers’ “conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from [Innis] was invited.” Id. at 302, 100 S.Ct. at 1690. Likewise, in the case before us, Detective Alston’s statements did not take the form of express questions directed to Quarles. Rather, they were simply declarative statements addressed to Officer Papeo.[3]
While the majority interprets Detective Alston’s statements as being, at least in part, addressed to Quarles, the trial court expressly found that all of Detective Alston’s statements were addressed to Officer Papeo. In rejecting this factual finding, the majority ignores the totality of Detective Alston’s testimony and fixes on an obvious mistake in the Commonwealth’s recitation of facts in its brief. From that error, the majority *30 concludes, in a footnote, that “the Commonwealth implicitly concedes that the trial court’s [factual] finding ... was plainly wrong.”[4] Supra at 18 n. 1, 707 S.E.2d at 9 n. 1. I suggest that the more appropriate course in reviewing factual findings of a trial court is to review the actual testimony of the witnesses who appeared at the hearing.
During his direct examination, Detective Alston unequivocally said that his statement, addressed to Officer Papeo, was, “[T]hat’s fine if he doesn’t want to talk to me.” Then, during a disjointed and admittedly confusing cross-examination, defense counsel attempted to impeach Detective Alston with a summary of the statement that the Commonwealth had included in its written response to the motion to suppress.[5] It was at this point that defense counsel, in his questioning, used the pronoun “you” in place of “he.” Detective Alston responded, “I think what you added in is that last sentence [containing the pronoun ‘you’], and that’s fine. I may have said that too. I may have added that in there. It’s possible.” However, *31 Detective Alston remained insistent throughout the direct examination, cross-examination, and re-direct examination that he was talking to Officer Papeo when he said what he did. Irrespective of the pronoun used, it is the trial court’s factual finding in favor of the Commonwealth that is relevant to the analysis. Based on what I believe to be a fair reading of the entire testimony, I cannot say that this factual finding was plainly wrong. See Blow v. Commonwealth, 52 Va.App. 533, 542, 665 S.E.2d 254, 258 (2008) (“[W]e are bound by the trial court’s factual findings unless they are ‘plainly wrong’ or without evidentiary support.” (quoting Code § 8.01-680)). Thus, I reject the majority’s premise that this statement was directed specifically to Quarles, and I disagree with the conclusion that it was anything other than “a dialogue between the two officers to which no response from [Quarles] was invited.” Innis, 446 U.S. at 302, 100 S.Ct. at 1690.
The majority also fails to properly analyze the other factors the Court found relevant in Innis—factors that I believe require a similar conclusion in this case. For instance, the Court in Innis concluded that the officers’ behavior did not constitute the “ ‘functional equivalent’ of questioning,” because there was no indication “that the officers were aware that [Innis] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children.” Id. Similarly, there is no evidence here that Detective Alston knew Quarles was “peculiarly susceptible” to being confronted with the evidence against him. I cannot conclude that Quarles’ asking to speak to an attorney and then remaining steadfastly silent for forty-five minutes to an hour while sitting with another police officer in a room should have led the police to think that Quarles was “peculiarly susceptible” to hearing any comments from one police officer to another concerning the evidence against him.
Additionally, the majority attempts to distinguish Innis by declaring that “Detective Alston should have known that his pointed criticism of Quarles’ defense was reasonably likely to elicit an incriminating response.” See supra at 25, 707 S.E.2d at 12. I disagree. I find no logical basis to distinguish what *32 could arguably be characterized as an emotional appeal to Innis’ conscience from a “pointed criticism of Quarles’ defense.” This is simply a distinction without a difference. More to the point, however, confronting a suspect with evidence against him does not necessarily constitute interrogation under the Innis standard. See State v. Cunningham, 144 Wis.2d 272, 423 N.W.2d 862, 866 (1988) (explaining that Innis does not dictate a per se rule “that whenever an officer confronts a suspect with incriminating physical evidence, or verbally summarizes the state’s case against the suspect, the officer engages in the functional equivalent of express questioning”). Rather, “[ejach case must be considered upon its own facts.” Id. at 274, 423 N.W.3d at 862-63; see also United States v. Suggs, 755 F.2d 1538, 1541-42 (11th Cir.1985) (holding there was no interrogation where defendant made incriminating statements upon being shown a copy of his indictment); Smith v. State, 414 Md. 357, 995 A.2d 685, 688-89, 691-92 (2010) (holding there was no interrogation where defendant made incriminating statement after officer walked by him and showed him the cocaine the officer had just found in his bedroom); People v. Benjamin, 101 Mich.App. 637, 300 N.W.2d 661, 663, 667 (1980) (holding there was no interrogation where defendant made incriminating statement when officer showed her the knives he found in her purse); State v. Gibson, 228 Neb. 455, 422 N.W.2d 570, 572, 577 (1988) (holding there was no interrogation where defendant made incriminating statement when officer said, “Oh, look what I found,” after discovering a loaded revolver); State v. Grisby, 97 Wash.2d 493, 647 P.2d 6, 12-13 (1982) (holding there was no interrogation where defendant made incriminating statement when officer placed physical evidence within defendant’s view); cf. State v. Jones, 386 So.2d 1363, 1365, 1367 (La.1980) (holding there was no interrogation where defendant made incriminating statement regarding his murder of his infant son after officer told him, “God takes care of little babies,” and said “the baby was already in heaven”).
Although the majority attempts to analogize this case to Ferguson v. Commonwealth, 52 Va.App. 324, 663 S.E.2d 505 *33 (2008) (en banc), aff'd, 278 Va. 118, 677 S.E.2d 45 (2009), the facts here are quite different from those in Ferguson. In Ferguson, a police officer spoke directly to the defendant in such an overbearing way that it was quite obvious he was trying to elicit an incriminating response. See Ferguson, 278 Va. at 124-25, 677 S.E.2d at 48. The continued interrogation, characterized by the Supreme Court as one containing “threats and coercive techniques,” included such direct statements and questions as: “The only hope you’ve got right now is to come as clean as you can get,” “Where was you at yesterday[?],” and, “[W]ho was with you yesterday?” Id. at 125, 677 S.E.2d at 48. The continued harangue in Ferguson stands in sharp contrast to the brief comments Detective Alston uttered to his partner, Officer Papeo.
Another factor noted by the Court in Innis, but overlooked by the majority here, was the lack of any evidence “to suggest that the police knew that [Innis] was unusually disoriented or upset at the time of his arrest.” Innis, 446 U.S. at 303, 100 S.Ct. at 1690. Here, there is no evidence before us suggesting that the police knew of anything that would have led them to believe Quarles was “unusually disoriented or upset” when Detective Alston came into the room where Quarles and Officer Papeo had been waiting.
Finally, the Innis Court directs us to consider the length and duration of the police officers’ conversation. Id. If, as the Supreme Court concluded, the conversation between the police officers in the car with Innis was “no more than a few offhand remarks,” I fail to see how Detective Alston’s brief monologue of three sentences here could qualify as anything more. In Innis, there was a conversation between two police officers in Innis’ presence. Id. at 294-95, 100 S.Ct. at 1686-87. Here, there were a few short sentences spoken by one police officer to another in Quarles’ presence. Surely, Detective Alston’s remarks were no more provocative than those in Innis. Simply put, “[t]his is not a case where the police carried on a lengthy harangue in the presence of the suspect.” Id. at 303, 100 S.Ct. at 1691.
*34 The Court in Innis mentioned the trial judge’s conclusion in that case that “it was ‘entirely understandable that [the officers] would voice their concern [for the safety of the handicapped children] to each other.’ ” Id. at 303 n. 9, 100 S.Ct. at 1690 n. 9 (alterations in original). Likewise, I believe it was entirely understandable that an exasperated Detective Alston, upon learning that Quarles was not going to incriminate himself, would utter the kind of brief, immediate remarks that he did.
If the United States Supreme Court could say—and did say—that the officers’ conversation in Innis was not “particularly ‘evocative,’ ” id. at 303, 100 S.Ct. at 1691, I cannot say that Detective Alston’s comments here were any more “evocative.”[6] The Supreme Court has held that a statement to the effect of, “I sure hope a poor handicapped girl doesn’t find that gun and shoot herself with it,” is merely “subtle compulsion” and not “interrogation.” With that comment as a measure, I fail to see how the statement here is so compulsive that it rises to the functional equivalent of an interrogation.
Accordingly, based on the facts, reasoning, and holding in Innis, I would affirm Quarles’ convictions. Therefore, I respectfully dissent from the majority’s opinion.

. The majority proclaims that "Detective Alston’s comment was not part of a simple ‘dialogue between the two officers’ like the exchange between the officers in Innis,” because "Detective Alston acknowledged that he directed his statement, at least in part, to Quarles.” Supra at 24, 707 S.E.2d at 12. In reality, what Detective Alston acknowledged was the obvious—that Quarles was in the room and could hear what he said. I find this no more meaningful than the fact that Innis was in a car with three officers and could hear what they said to one another.

. In its brief, the Commonwealth quoted Detective Alston, using the pronoun "you” and referencing pages 30-31 and 36-37 of the appendix. However, Detective Alston never said what the Commonwealth attributed to him. On page 30, he used the pronoun "he," and on pages 36-37, he denied that he made the statement defense counsel read to him. The majority seizes on this obvious mistake in the Commonwealth's brief to conclude that "the Commonwealth implicitly concedes that the trial court’s finding regarding Detective Alston’s use of the pronoun 'he' was plainly wrong,” and the majority therefore "reject[s] the trial court’s finding that Detective Alston used the pronoun 'he.' ” Supra at 18 n. 1, 707 S.E.2d at 9 n. 1. In doing so, the majority cites no authority for the proposition that we can disregard a trial court’s express factual findings and instead adopt an "implicit concession” from a party’s brief. Although the majority cites Shears v. Commonwealth, 23 Va.App. 394, 398, 477 S.E.2d 309, 311 (1996), that case says nothing about an implicit concession that a trial court was plainly wrong in its factual findings. While we certainly can rely on a party's concessions of fact, Logan v. Commonwealth, 47 Va.App. 168, 172, 622 S.E.2d 771, 773 (2005) (en banc), before we do so we should ensure that the concession was intended and not simply implied from an erroneous recitation of facts.

. The trial court expressly concluded that "the Commonwealth filed papers that characterized Detective Alston’s statement differently than Detective Alston [did in his own testimony].”

. The Wisconsin Supreme Court used a similar mode of analysis in Cunningham on the facts before it in that case. In Cunningham, the police “found a loaded revolver between the mattress and box spring” in a bedroom, and one of the officers showed the gun to the defendant, told him where it had been found, and said to another officer, “This was apparently what Mr. Cunningham was running into the bedroom for.” Cunningham, 144 Wis.2d at 275, 423 N.W.2d at 863. These actions prompted the defendant to say "something to the effect that it was his bedroom and that he had a right to have a gun.” Id. The court held the police’s conduct was "not the functional equivalent of express questioning.” Id. I believe the court’s reasoning in Cunningham applies with equal force to the case before us: “The facts of this case are stronger for the prosecution than those in Innis. The police officer’s conduct and words in this case were not as provocative as the *35 officer’s comments in Innis." Id. at 283, 423 N.W.3d at 866 (emphasis added).