COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, McClanahan, Haley,
          Petty, Beales, Powell and Alston
Argued at Richmond, Virginia

JERROD TYREE QUARLES
                                                    OPINION BY
v.     Record No. 1988-09-2              JUDGE ROSSIE D. ALSTON, JR.
                                              MARCH 29, 2011
COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Bradley B. Cavedo, Judge

Catherine M. French, Supervising Assistant Public Defender
(Office of the Public Defender, on brief), for appellant.

Josephine F. Whalen, Assistant Attorney General II (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Jerrod Tyree Quarles appeals from his convictions for robbery and conspiracy to commit

robbery.  After granting his petition for appeal, a divided panel of this Court affirmed his

convictions.  See Quarles v. Commonwealth, No. 1988-09-2, 2010 Va. App. LEXIS 326, at *7

(Va. Ct. App. Aug. 10, 2010).  Quarles' petition for *en banc* review by this Court was then

granted.  Quarles argues that the trial court erred in denying his motion to suppress incriminating

statements he made to the police during a custodial interrogation.  Relying on Miranda v.

Arizona, 384 U.S. 436 (1966), and its progeny, Quarles argues that a police detective

impermissibly reinitiated communication with him after he invoked his right to counsel.  We

agree and hold that the police detective impermissibly reinitiated communication with Quarles

after Quarles unequivocally requested the assistance of counsel.  Accordingly, Quarles'

subsequent waiver of Miranda rights was not voluntary, and his subsequent incriminating

statements were inadmissible.

I.  BACKGROUND

On October 21, 2008, Quarles and an eleven-year-old boy (co-defendant) were arrested for robbery and conspiracy to commit robbery.  The pair were transported to the police station, where they were separated.  Officer Papeo stayed with Quarles in the main detectives' office, where he informed Quarles of his <u>Miranda</u> rights.  Quarles signed the waiver of rights form, but informed Officer Papeo that he wanted to speak to an attorney.  Meanwhile, Detective Alston spoke with co-defendant for approximately forty-five minutes, during which time co-defendant confessed that he and Quarles had planned to "rob a white lady or white people in the VCU area" and that they had robbed the victim, whom co-defendant described as a "white lady."

After obtaining co-defendant's confession, Detective Alston joined Officer Papeo and Quarles in the detectives' office.  Officer Papeo gave Detective Alston Quarles' signed waiver form and informed Detective Alston that Quarles had invoked his right to counsel.  Detective Alston then stated, "[T]hat's fine if he doesn't want to talk to me.  I wasn't the person that robbed a white lady and hit her in the head with a brick.  If that's the story you want to tell the judge[,] that's fine."[1]  Immediately after this exchange, Quarles told the officers that he wished to talk to them.  Detective Alston responded, "No, that's fine, you don't have to talk to me, I'm

---

[1] At the hearing on the motion to suppress, this statement was introduced through Detective Alston's testimony, rather than through an audio or video recording.  Although the detective initially testified that he used the pronoun "he" rather than "you," the detective later acknowledged in response to questioning from both defense counsel and the prosecutor that he said, "If that's the story you want to tell the judge that's fine."

In making its ruling on the motion to suppress, the trial court found that Detective Alston said, "[I]f that is what he wants to tell the judge[,] that's fine."  On brief, the Commonwealth states that Detective Alston used the pronoun "you," as opposed to "he," as the trial court found.  The Commonwealth also adopted this position before the panel of this Court.  As such, the Commonwealth implicitly concedes that the trial court's finding regarding Detective Alston's use of the pronoun "he" was plainly wrong.

For the foregoing reasons, we reject the trial court's finding that Detective Alston used the pronoun "he."  <u>See</u> <u>Shears v. Commonwealth</u>, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996).

good." Quarles then again stated that he wanted to talk to them. Detective Alston informed Quarles that he must sign another waiver of rights form and that he must write on it that he wished to speak to the detectives. Quarles signed the form and wrote on the back that he had asked for an attorney, but had changed his mind and wished to speak to Detective Alston. Quarles subsequently admitted that he and co-defendant decided to "rob a white lady in the VCU area," he gave co-defendant a knife, and he armed himself with a brick wrapped in a shirt. He stated that he hit the victim on the side of the head with the brick. The victim resisted, and Quarles and co-defendant fled the scene. Thereafter, the police arrested Quarles and co-defendant.

Prior to trial, Quarles moved to suppress the statements he made after he waived his right to counsel the second time. During Quarles' motion to suppress, Detective Alston stated on cross-examination that because Quarles was in the room, his statement regarding Quarles' decision not to talk was directed at Quarles, as well as Officer Papeo. Detective Alston further testified that he referred to the victim as a "white lady" because co-defendant used that expression during his confession.

The trial court denied Quarles' motion to suppress, finding that Detective Alston made his statement to Officer Papeo alone and that even if Detective Alston made his statement to Quarles, the statement "was not a reinitiation, and it was not a functional equivalent of interrogation." The trial court further found that after invoking his right to counsel, Quarles reinitiated the conversation with Detective Alston and made a knowing and intelligent waiver of his right to counsel.

Quarles was subsequently convicted of robbery and conspiracy to commit robbery. This appeal followed.

## II. ANALYSIS

"In reviewing a trial court's denial of a motion to suppress, '[t]he burden is upon [the defendant] to show that the ruling, when th[e] evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)). In addition,

> [w]e review the trial court's findings of historical fact only for clear error. See Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996). However, we review *de novo* the trial court's application of defined legal standards to the particular facts of a case. Ornelas v. United States, 517 U.S. 690, 697 (1996).

Ferguson v. Commonwealth, 52 Va. App. 324, 334, 663 S.E.2d 505, 510 (2008) (*en banc*), aff'd, 278 Va. 118, 677 S.E.2d 45 (2009).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To guard against potential compulsion, the United States Supreme Court announced a number of rights to protect the Fifth Amendment privilege against self-incrimination, including the right to have an attorney present during custodial interrogation. Miranda, 384 U.S. at 469-73. Under Miranda, "[i]f [the accused] states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 473-74.

In addition, "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Therefore, "when an accused has invoked his right to have counsel present during custodial interrogation, a

- 4 -

valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484.

Over time, what facts or circumstances amount to a constitutional violation have become more difficult to define. This Court in Ferguson, 52 Va. App. 324, 663 S.E.2d 505, provided a three-part analysis to determine the admissibility of a suspect's statement under Edwards:

> First, the trial court must determine whether the accused "unequivocally" invoked his or her right to counsel. Second, the trial court must determine whether the accused, rather than the authorities, initiated further discussions or meetings with the police. Third, if the accused did initiate further discussions or conversations with police, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel.

52 Va. App. at 335-36, 663 S.E.2d at 510 (citing Giles v. Commonwealth, 28 Va. App. 527, 532, 507 S.E.2d 102, 105 (1998)).

This prophylactic rule reflects "[t]he underlying concern of Miranda, Edwards, and their progeny[:] the coercive atmosphere of custodial interrogation and the state of mind of the suspect." Commonwealth v. Gregory, 263 Va. 134, 147, 557 S.E.2d 715, 722 (2002). The protections provided by Miranda

> to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self-incrimination," are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

Arizona v. Roberson, 486 U.S. 675, 681 (1988) (quoting Miranda, 384 U.S. at 467). Moreover, in a custodial setting, the use of ploys and other techniques of persuasion, no less than express questioning, may amount to interrogation. Rhode Island v. Innis, 446 U.S. 291, 299 (1980).

In this case, it is undisputed that Quarles unequivocally invoked his right to counsel when he was alone in the detectives' office with Officer Papeo. Our inquiry thus turns to whether Detective Alston engaged in an impermissible interrogation of Quarles after Quarles invoked his constitutional rights. See Edwards, 451 U.S. at 484-85; Ferguson, 52 Va. App. at 335-36, 663 S.E.2d at 510.

> [T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Innis, 446 U.S. at 301-02 (footnotes omitted). "If a [suspect's] statement is 'not foreseeable, then it is volunteered.'" Gates v. Commonwealth, 30 Va. App. 352, 356, 516 S.E.2d 731, 733 (1999) (quoting Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988)).

Furthermore, when determining whether the foreseeable response is incriminating, "'no distinction may be drawn between inculpatory statements and statements alleged to be merely exculpatory.'" Innis, 446 U.S. at 301 n.5 (quoting Miranda, 384 U.S. at 477). This protective measure reflects the reality that "'statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.'" Id. (quoting Miranda, 384 U.S. at 477). As such, if a police officer should have known that his words were reasonably likely to

- 6 -

elicit an attempt by a defendant to exculpate himself, those words constitute an interrogation. See id. at 301.

Based on these principles, we "focus[ ] primarily upon the perceptions of the suspect," id., and determine, in this case, whether Detective Alston's words or actions constituted a coercive pressure "above and beyond that inherent in custody itself," id. at 300.

Essentially, the Commonwealth argues on appeal that Detective Alston's comment was, like the comments in Innis, simply an exchange of words between the officers, and thus should not be deemed a reinitiation of communication with Quarles. The salient facts in Innis are significant. In Innis, police officers were transporting Innis, a murder suspect, to the police station. Id. at 294. During a conversation *between the officers* en route, one officer expressed concern about the location of a missing firearm used in the crime because the crime had occurred near a school for handicapped children. Id. at 294-95. He said, "God forbid one of them might find the weapon with shells and they might hurt themselves." Id. Innis then interrupted the officers and offered to show them the location of the firearm. Id. at 295.

The Supreme Court held that the conversation between the officers included no express questioning of Innis, but "[r]ather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited." Id. at 302. Because no response from Innis was invited, the Supreme Court found that the officers' conversation could be considered no more than "subtle compulsion." Id. at 303. The Supreme Court stated that it was error to equate such "'subtle compulsion' with interrogation."[2] Id. The

---

[2] The Supreme Court noted in Innis another example of subtle compulsion:

> By way of example, if the police had done no more than to drive past the site of the concealed weapon while taking the most direct route to the police station, and if the respondent, upon noticing for the first time the proximity of the school for handicapped children, had blurted out that he would show the officers where the gun was

- 7 -

Supreme Court held that because the officers should not have known that their conversation was reasonably likely to elicit an incriminating response from Innis, the officers did not functionally interrogate him. Id. at 303.

Detective Alston's statement is distinguishable from those in Innis. First, on its face, it was nominally directed at Quarles, as evidenced by Detective Alston's use of the pronoun "you." If Detective Alston was directing his comment solely at Officer Papeo, he would have chosen the pronoun "he," rather than "you," when he said, "If that's the story you want to tell the judge[,] that's fine." Furthermore, at the motion to suppress hearing, Detective Alston acknowledged that he directed his statement, at least in part, to Quarles. In this way, Detective Alston's comment was not part of a simple "dialogue between the two officers" like the exchange between the officers in Innis.

Second, when Detective Alston spoke to Quarles, he effectively informed Quarles of the evidence against him, using the specific terminology provided by Quarles' co-defendant. The detective identified the victim in the case as a "white lady" after hearing co-defendant confess that Quarles and co-defendant's plan was to "rob a white lady or white people in the VCU area." In Miranda, the Supreme Court in dicta disapproved of police departments' use of "lineups in which a coached witness would pick the defendant as the perpetrator." Id. at 299 (citing Miranda, 384 U.S. at 453). The Innis Court recognized that this practice "was designed to establish that the defendant was in fact guilty as a predicate for further interrogation." Id. (citing Miranda, 384 U.S. at 453). The detective's words in the instant case had a remarkably similar

---

located, it could not seriously be argued that this "subtle compulsion" would have constituted "interrogation" within the Miranda opinion.

446 U.S. at 303 n.10.

- 8 -

effect. They amounted to a specific warning to Quarles that co-defendant had implicated Quarles in the robbery and the conspiracy to rob the victim.

The second half of Detective Alston's statement, "If that's the story you want to tell the judge[,] that's fine," challenged Quarles' ability to exculpate himself. The detective's statement was tantamount to a veiled threat signaling to Quarles that unless he made a statement to the officers, the judge would look unfavorably upon Quarles, based on co-defendant's confession.

Clearly, Detective's Alston's words rise above the mere "subtle compulsion" contemplated by the Supreme Court in Innis. When we consider Detective Alston's statements from Quarles' perspective, we conclude Detective Alston should have known that his pointed criticism of Quarles' defense was reasonably likely to elicit an incriminating response. The legal significance of Detective Alston's unsolicited statements to Quarles can be resolved by consideration of analogous circumstances addressed by this Court sitting *en banc* in Ferguson, 52 Va. App. 324, 663 S.E.2d 505. In that case, after the defendant clearly invoked his right to counsel twice, the investigating officer continued to speak to the defendant. Id. at 331, 663 S.E.2d at 508. This Court found that the officer's subsequent questioning was designed to elicit an incriminating response, when the officer informed the defendant that there was eyewitness testimony placing the defendant's vehicle at the scene of the crime, told the defendant that "the only hope" for the defendant was to tell his side of the story, and questioned whether the defendant's alibi would withstand scrutiny. Id. at 341, 663 S.E.2d at 513. Similarly, Detective Alston informed Quarles of co-defendant's inculpatory statement and also suggested that Quarles would have no defense to present to the judge at trial.

Given the content and context of Detective Alston's statement, the trial court erred in holding that his comment was not the functional equivalent of interrogation and that Quarles reinitiated communication by asserting his wish to talk.

> Once an accused asserts his or her right to counsel, subsequent waiver of that right is not sufficient to make admissible any incriminating statements thereafter obtained, even if investigators have re-Mirandized the accused, unless the statements are initiated by the defendant and shown to be based on a knowing, intelligent, and voluntary waiver.

Giles, 28 Va. App. at 531, 507 S.E.2d at 105.  Since Detective Alston reinitiated communication with Quarles after Quarles' assertion of his right to the assistance of counsel, Quarles' subsequent waiver of his Miranda rights was not voluntary.  Id.  Thus, his subsequent incriminating statements were inadmissible.  It follows that the motion to suppress should have been granted and that the trial court's denial of that motion was error.

### III.  CONCLUSION

We hold that the trial court erred in denying Quarles' motion to suppress the statements he made to the officers.  Accordingly, we reverse Quarles' convictions and remand the case for a new trial if the Commonwealth be so advised.

Reversed and remanded.

Petty, J., with whom Kelsey, McClanahan, and Haley, JJ., join, dissenting.

Because I believe that the police officer's remarks in this case are no more coercive than the police officers' discussion in Rhode Island v. Innis, 446 U.S. 291 (1980), I respectfully dissent from the majority's holding. While the majority certainly gives due attention to the *language* in Innis setting forth the meaning of "interrogation," I believe the majority fails to give proper weight to the *holding* of Innis on its specific *facts*. To me, the answer to the question before us is straightforward—if the statements of the officers in Innis did not constitute "interrogation," neither did the statements of Detective Alston.

At the outset, I do not take issue with the majority's general discussion of the scope of Miranda v. Arizona, 384 U.S. 436 (1996), and Edwards v. Arizona, 451 U.S. 477 (1981). However, I also remain mindful that:

> Suppression of evidence . . . has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," which sometimes include setting the guilty free and the dangerous at large. [The United States Supreme Court has] therefore been "cautio[us] against expanding" it, and "[has] repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." [The Court has] rejected "[i]ndiscriminate application" of the rule, and [has] held it to be applicable only "where its remedial objectives are thought most efficaciously served"—that is, "where its deterrence benefits outweigh its 'substantial social costs.'"

Hudson v. Michigan, 547 U.S. 586, 591 (2006) (some alterations in original) (citations omitted).

As the majority notes, the United States Supreme Court has defined "interrogation" for purposes of Miranda as referring "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301 (footnote omitted). In keeping with the Supreme Court's direction that "[t]he latter portion of this definition focuses primarily upon the perceptions of the

- 11 -

suspect, rather than the intent of the police," id., we have previously held that "'the Innis standard . . . requir[es] a determination of whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response,'" Timbers v. Commonwealth, 28 Va. App. 187, 196, 503 S.E.2d 233, 237 (1998) (quoting Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988)).

Importantly, however, the Supreme Court in Innis also stated that "subtle compulsion" is not sufficient to constitute "interrogation" as the Court defined that term. Innis, 446 U.S. at 303. According to the Court, "subtle compulsion" does not, as a matter of law, rise to the level of "words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Id.; see also Arizona v. Mauro, 481 U.S. 520, 529 (1987) (recognizing Innis' holding that "subtle compulsion" is not interrogation). "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." Mauro, 481 U.S. at 529. Thus, even were we to assume that Detective Alston personally *hoped* that some sort of "subtle compulsion" would induce Quarles to incriminate himself, the Supreme Court has already told us such behavior is *not* sufficient to constitute interrogation. When I examine the facts and holding in Innis, I am convinced that whatever subtle compulsion may have been present in this case does not rise to the level of "interrogation."

In Innis, three police officers accompanied Innis to the police station in a police car after he had been arrested. Innis, 446 U.S. at 294. Innis was suspected of having committed murder and robbery with a shotgun. See id. at 293, 295. Innis did not have a shotgun with him when the police arrested him. See id. at 294. The police advised Innis of his Miranda rights, and Innis requested an attorney. Id. On the way to the police station, one of the officers remarked to another officer that because of a school for handicapped children in the vicinity, "there's a lot of handicapped children running around in this area, and God forbid one of them might find a

- 12 -

weapon with shells and they might hurt themselves." Id. at 294-95. The third officer in the car testified that the first officer "said it would be too bad if the little—I believe he said a girl—would pick up the gun, maybe kill herself." Id. at 295. The conversation did not stop there—the second officer was conversing with the first officer, agreeing "that it was a safety factor and that we should, you know, continue to search for the weapon and try to find it." Id.

Upon hearing this exchange, Innis interrupted the officers' dialogue and asked them to take him back so he could show them where the gun was. Id. Once they arrived back at the arrest scene, Innis was again advised of his Miranda rights, but he stated that he "wanted to get the gun out of the way because of the kids in the area in the school." Id. Innis then led the police to where the gun was hidden. Id.

On these facts, the Supreme Court held that the behavior of the police officers in the car with Innis did not constitute interrogation. Id. at 302-03. Although the Rhode Island Supreme Court had held that the officers' behavior was interrogation, since it constituted "subtle coercion" or "subtle compulsion," id. at 296, 303, the United States Supreme Court said that "subtle compulsion" is *not sufficient* to constitute "interrogation" for purposes of Miranda, id. at 303. An analysis of the Court's reasoning on the facts in Innis leads me to conclude that the facts in the present case are no closer to "interrogation" than the facts in Innis were.

In Innis, the Court noted that there was no "express questioning" of the defendant, and that the police officers' "conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from [Innis] was invited." Id. at 302. Likewise, in the case before us, Detective Alston's statements did not take the form of express questions

directed to Quarles. Rather, they were simply declarative statements addressed to Officer Papeo.[3]

While the majority interprets Detective Alston's statements as being, at least in part, addressed to Quarles, the trial court expressly found that all of Detective Alston's statements were addressed to Officer Papeo. In rejecting this factual finding, the majority ignores the totality of Detective Alston's testimony and fixes on an obvious mistake in the Commonwealth's recitation of facts in its brief. From that error, the majority concludes, in a footnote, that "the Commonwealth implicitly concedes that the trial court's [factual] finding . . . was plainly wrong."[4] Supra at 2 n.1. I suggest that the more appropriate course in reviewing factual findings of a trial court is to review the actual testimony of the witnesses who appeared at the hearing.

During his direct examination, Detective Alston unequivocally said that his statement, addressed to Officer Papeo, was, "[T]hat's fine if he doesn't want to talk to me." Then, during a

---

[3] The majority proclaims that "Detective Alston's comment was not part of a simple 'dialogue between the two officers' like the exchange between the officers in Innis," because "Detective Alston acknowledged that he directed his statement, at least in part, to Quarles." Supra at 8. In reality, what Detective Alston acknowledged was the obvious—that Quarles was in the room and could hear what he said. I find this no more meaningful than the fact that Innis was in a car with three officers and could hear what they said to one another.

[4] In its brief, the Commonwealth quoted Detective Alston, using the pronoun "you" and referencing pages 30-31 and 36-37 of the appendix. However, Detective Alston never said what the Commonwealth attributed to him. On page 30, he used the pronoun "he," and on pages 36-37, he denied that he made the statement defense counsel read to him. The majority seizes on this obvious mistake in the Commonwealth's brief to conclude that "the Commonwealth implicitly concedes that the trial court's finding regarding Detective Alston's use of the pronoun 'he' was plainly wrong," and the majority therefore "reject[s] the trial court's finding that Detective Alston used the pronoun 'he.'" Supra at 2 n.1. In doing so, the majority cites no authority for the proposition that we can disregard a trial court's express factual findings and instead adopt an "implicit concession" from a party's brief. Although the majority cites Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996), that case says nothing about an implicit concession that a trial court was plainly wrong in its factual findings. While we certainly can rely on a party's concessions of fact, Logan v. Commonwealth, 47 Va. App. 168, 172, 622 S.E.2d 771, 773 (2005) (en banc), before we do so we should ensure that the concession was intended and not simply implied from an erroneous recitation of facts.

disjointed and admittedly confusing cross-examination, defense counsel attempted to impeach Detective Alston with a summary of the statement that the Commonwealth had included in its written response to the motion to suppress.[5] It was at this point that defense counsel, in his questioning, used the pronoun "you" in place of "he." Detective Alston responded, "I think what you added in is that last sentence [containing the pronoun 'you'], and that's fine. I may have said that too. I may have added that in there. It's possible." However, Detective Alston remained insistent throughout the direct examination, cross-examination, and re-direct examination that he was talking to Officer Papeo when he said what he did. Irrespective of the pronoun used, it is the trial court's factual finding in favor of the Commonwealth that is relevant to the analysis. Based on what I believe to be a fair reading of the entire testimony, I cannot say that this factual finding was plainly wrong. See Blow v. Commonwealth, 52 Va. App. 533, 542, 665 S.E.2d 254, 258 (2008) ("[W]e are bound by the trial court's factual findings unless they are 'plainly wrong' or without evidentiary support." (quoting Code § 8.01-680)). Thus, I reject the majority's premise that this statement was directed specifically to Quarles, and I disagree with the conclusion that it was anything other than "a dialogue between the two officers to which no response from [Quarles] was invited." Innis, 446 U.S. at 302.

The majority also fails to properly analyze the other factors the Court found relevant in Innis—factors that I believe require a similar conclusion in this case. For instance, the Court in Innis concluded that the officers' behavior did not constitute the "'functional equivalent' of questioning," because there was no indication "that the officers were aware that [Innis] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." Id. Similarly, there is no evidence here that Detective Alston knew Quarles was

---

[5] The trial court expressly concluded that "the Commonwealth filed papers that characterized Detective Alston's statement differently than Detective Alston [did in his own testimony]."

- 15 -

"peculiarly susceptible" to being confronted with the evidence against him. I cannot conclude that Quarles' asking to speak to an attorney and then remaining steadfastly silent for forty-five minutes to an hour while sitting with another police officer in a room should have led the police to think that Quarles was "peculiarly susceptible" to hearing any comments from one police officer to another concerning the evidence against him.

Additionally, the majority attempts to distinguish Innis by declaring that "Detective Alston should have known that his pointed criticism of Quarles' defense was reasonably likely to elicit an incriminating response." See supra at 9. I disagree. I find no logical basis to distinguish what could arguably be characterized as an emotional appeal to Innis' conscience from a "pointed criticism of Quarles' defense." This is simply a distinction without a difference. More to the point, however, confronting a suspect with evidence against him does not necessarily constitute interrogation under the Innis standard. See State v. Cunningham, 423 N.W.2d 862, 866 (Wis. 1988) (explaining that Innis does not dictate a per se rule "that whenever an officer confronts a suspect with incriminating physical evidence, or verbally summarizes the state's case against the suspect, the officer engages in the functional equivalent of express questioning"). Rather, "[e]ach case must be considered upon its own facts." Id. at 862-63; see also United States v. Suggs, 755 F.2d 1538, 1541-42 (11th Cir. 1985) (holding there was no interrogation where defendant made incriminating statements upon being shown a copy of his indictment); Smith v. State, 995 A.2d 685, 688-89, 691-92 (Md. 2010) (holding there was no interrogation where defendant made incriminating statement after officer walked by him and showed him the cocaine the officer had just found in his bedroom); People v. Benjamin, 300 N.W.2d 661, 663, 667 (Mich. Ct. App. 1980) (holding there was no interrogation where defendant made incriminating statement when officer showed her the knives he found in her purse); State v. Gibson, 422 N.W.2d 570, 572, 577 (Neb. 1988) (holding there was no interrogation where

defendant made incriminating statement when officer said, "Oh, look what I found," after discovering a loaded revolver); State v. Grisby, 647 P.2d 6, 12-13 (Wash. 1982) (holding there was no interrogation where defendant made incriminating statement when officer placed physical evidence within defendant's view); cf. State v. Jones, 386 So. 2d 1363, 1365, 1367 (La. 1980) (holding there was no interrogation where defendant made incriminating statement regarding his murder of his infant son after officer told him, "God takes care of little babies," and said "the baby was already in heaven").

Although the majority attempts to analogize this case to Ferguson v. Commonwealth, 52 Va. App. 324, 663 S.E.2d 505 (2008) (en banc), aff'd, 278 Va. 118, 677 S.E.2d 45 (2009), the facts here are quite different from those in Ferguson. In Ferguson, a police officer spoke directly to the defendant in such an overbearing way that it was quite obvious he was trying to elicit an incriminating response. See Ferguson, 278 Va. at 124-25, 677 S.E.2d at 48. The continued interrogation, characterized by the Supreme Court as one containing "threats and coercive techniques," included such direct statements and questions as: "The only hope you've got right now is to come as clean as you can get," "Where was you at yesterday[?]," and, "[W]ho was with you yesterday?" Id. at 125, 677 S.E.2d at 48. The continued harangue in Ferguson stands in sharp contrast to the brief comments Detective Alston uttered to his partner, Officer Papeo.

Another factor noted by the Court in Innis, but overlooked by the majority here, was the lack of any evidence "to suggest that the police knew that [Innis] was unusually disoriented or upset at the time of his arrest." Innis, 446 U.S. at 303. Here, there is no evidence before us suggesting that the police knew of anything that would have led them to believe Quarles was "unusually disoriented or upset" when Detective Alston came into the room where Quarles and Officer Papeo had been waiting.

Finally, the Innis Court directs us to consider the length and duration of the police officers' conversation. Id. If, as the Supreme Court concluded, the conversation between the police officers in the car with Innis was "no more than a few offhand remarks," I fail to see how Detective Alston's brief monologue of three sentences here could qualify as anything more. In Innis, there was a conversation between two police officers in Innis' presence. Id. at 294-95. Here, there were a few short sentences spoken by one police officer to another in Quarles' presence. Surely, Detective Alston's remarks were no more provocative than those in Innis. Simply put, "[t]his is not a case where the police carried on a lengthy harangue in the presence of the suspect." Id. at 303.

The Court in Innis mentioned the trial judge's conclusion in that case that "it was 'entirely understandable that [the officers] would voice their concern [for the safety of the handicapped children] to each other.'" Id. at 303 n.9 (alterations in original). Likewise, I believe it was entirely understandable that an exasperated Detective Alston, upon learning that Quarles was not going to incriminate himself, would utter the kind of brief, immediate remarks that he did.

If the United States Supreme Court could say—and did say—that the officers' conversation in Innis was not "particularly 'evocative,'" id. at 303, I cannot say that Detective Alston's comments here were any more "evocative."[6] The Supreme Court has held that a

---

[6] The Wisconsin Supreme Court used a similar mode of analysis in Cunningham on the facts before it in that case. In Cunningham, the police "found a loaded revolver between the mattress and box spring" in a bedroom, and one of the officers showed the gun to the defendant, told him where it had been found, and said to another officer, "This was apparently what Mr. Cunningham was running into the bedroom for." Cunningham, 423 N.W.2d at 863. These actions prompted the defendant to say "something to the effect that it was his bedroom and that he had a right to have a gun." Id. The court held the police's conduct was "not the functional equivalent of express questioning." Id. I believe the court's reasoning in Cunningham applies with equal force to the case before us: "The facts of this case are *stronger* for the prosecution than those in Innis. The police officer's conduct and words in this case were *not as provocative* as the officer's comments in Innis." Id. at 866 (emphasis added).

statement to the effect of, "I sure hope a poor handicapped girl doesn't find that gun and shoot herself with it," is merely "subtle compulsion" and not "interrogation." With that comment as a measure, I fail to see how the statement here is so compulsive that it rises to the functional equivalent of an interrogation.

Accordingly, based on the facts, reasoning, and holding in <u>Innis</u>, I would affirm Quarles' convictions. Therefore, I respectfully dissent from the majority's opinion.

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **14th** *day of* **September, 2010**.

Jerrod Tyree Quarles, Appellant,

  against            Record No. 1988-09-2
                      Circuit Court Nos. CR09-F-0622 and CR09-F-0623

Commonwealth of Virginia, Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On August 20, 2010 came the appellant, by court-appointed counsel, and filed a petition requesting that the Court set aside the judgment rendered herein on August 10, 2010, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof, the petition for rehearing *en banc* is granted with regard to the issue(s) raised therein, the mandate entered herein on August 10, 2010 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. It is further ordered that the appellant shall file twelve additional copies of the appendix previously filed in this case. In addition, any party represented by counsel shall file twelve electronic copies of their brief (and the appendix, if the party filing the appendix is represented by

counsel) with the clerk of this Court.  The electronic copies must be filed on twelve separate CDs or

DVDs and must be filed in Adobe Acrobat Portable Document Format (PDF).[7]

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:    *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

---

[7] The guidelines for the creation and submission of a digital brief package can be found at www.courts.state.va.us, in the Court of Appeals section under "Resources and Reference Materials."

COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Alston and Senior Judge Willis
Argued at Richmond, Virginia


JERROD TYREE QUARLES
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1988-09-2                      JUDGE JERE M. H. WILLIS, JR.
                                                    AUGUST 10, 2010
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                           Bradley B. Cavedo, Judge

            Catherine M. French, Supervising Assistant Public Defender, for
            appellant.

            Josephine F. Whalen, Assistant Attorney General II (Kenneth  T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        On appeal from his convictions for robbery and conspiracy to commit robbery, Jerrod

Tyree Quarles contends the trial court erred in denying his motion to suppress his statements to

the police.  He argues that after he invoked his right to counsel pursuant to Miranda v. Arizona,

384 U.S. 436 (1966), Detective Alston impermissibly reinitiated communication with him.  He

further argues that his subsequent waiver of his Fifth Amendment rights and his agreement to

talk to the officers was not knowing and voluntary.  We affirm the judgment of the trial court.

        Quarles and an eleven-year-old boy (co-defendant) were arrested for robbery and

conspiracy to commit robbery and were transported to the police station.  For about forty-five

minutes, Alston spoke with the co-defendant, who gave a full confession, implicating Quarles in

the crimes.  While Alston was with the co-defendant, Officer Papeo stayed with Quarles in the

main detectives' office.  Papeo properly informed Quarles of his Miranda rights.  Quarles signed

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

a waiver of rights form, but stated that he wanted to speak to an attorney. Papeo did not question him.

When Alston finished speaking with the co-defendant, he returned to the detectives' office where Papeo was waiting with Quarles. Papeo gave Alston the signed waiver form and told him that Quarles had invoked his right to an attorney. Alston responded, "That's fine if he doesn't want to talk to me. I wasn't the one who robbed the white lady and hit her in the head with a brick. It that's the story you want to tell the judge, that's fine." Alston testified at the suppression hearing that while these comments were addressed to Papeo, Quarles was present and could hear them. Alston further testified that at the time he made those comments, the co-defendant's confession had described Quarles' participation in the robbery and "the case was made."

Alston testified that after his foregoing comments to Papeo, Quarles stated, "Hold on, I want to talk to you." Alston testified that he responded, "No, that's fine, you don't have to talk to me, I'm good." He testified that Quarles again said he wanted to talk. He testified that he told Quarles that he would need to sign another waiver of rights form and would need to write on the form that he wanted to talk. Quarles again signed the waiver form, writing on the back that he had asked for an attorney, but had changed his mind and wanted to speak to Alston. Alston again informed Quarles of his <u>Miranda</u> rights. Quarles then made the subject incriminating statements.

In denying Quarles' motion to suppress the incriminating statements, the trial court found that Alston's comments were in response to Papeo's statement that Quarles had invoked his right to an attorney. The trial court further held that even if Alston's comments were addressed to Quarles, they were not the functional equivalent of interrogation, but the opposite, because Alston had reaffirmed to Quarles that he did not need to talk.

"In reviewing a trial court's denial of a motion to suppress, 'the burden is upon [the defendant] to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." To guard against potential compulsion, the United States Supreme Court announced a number of rights to protect the Fifth Amendment privilege of self-incrimination, including the right to have an attorney present during custodial interrogation. Miranda, 384 U.S. at 469-73.

> [T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980) (footnotes omitted).

In Innis, two officers were transporting Innis, a murder suspect, to the police station. Innis had invoked his Fifth Amendment right to an attorney. During a conversation between the officers while en route to the station, one officer expressed concern about the location of a missing firearm used in the crime because the crime had occurred near a school for handicapped

children. He said, "God forbid one of them might find the weapon with shells and they might hurt themselves." Innis interrupted and offered to show the officers the location of the firearm. Id. at 294-95. Ruling that Innis was not interrogated, the Supreme Court held that the conversation between the officers included no express questioning of Innis, but "[r]ather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited." Id. at 302.

Quarles argues that Alston's comments were the functional equivalent of interrogation, rendering his subsequent confession involuntary and inadmissible. The record does not support this assertion. Nothing Alston said to Papeo was addressed to Quarles. His comments reflected no expectation or hope of response by Quarles. His comments were not reasonably likely to elicit a reply from Quarles. He felt no need to interrogate Quarles because "the case was made." As in Innis, the conversation between Alston and Papeo was nothing more than a few offhand remarks between the two officers to which no response from Quarles was invited. See also Gates v. Commonwealth, 30 Va. App. 352, 356, 516 S.E.2d 731, 733 (1999).

Alston confirmed his respect for Quarles' assertion of his wish for an attorney by advising him again of his Miranda rights and by requiring that he again sign the waiver form, noting his change of mind and wish to talk without the presence of an attorney, before accepting a statement from him.

Under these circumstances, the trial court did not err in holding that Alston's comments were not the functional equivalent of interrogation, that Quarles reinitiated communication by asserting his wish to talk, that Quarles' Fifth Amendment rights were not violated, and that his confession was voluntary and admissible. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

Alston, J., dissenting.

I respectfully dissent from the majority's finding that the trial court did not err in denying appellant's motion to suppress his incriminating statements.

Under Miranda v. Arizona, 384 U.S. 436, 473-74 (1966), "[i]f [the accused] states that he wants an attorney, the interrogation must cease until an attorney is present."  Furthermore, "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).  In Ferguson v. Commonwealth, 52 Va. App. 324, 663 S.E.2d 505 (2008) (*en banc*), aff'd, 278 Va. 118, 677 S.E.2d 45 (2009), this Court provided a three-part analysis to determine the admissibility of a statement under Edwards:

> First, the trial court must determine whether the accused "unequivocally" invoked his or her right to counsel.  Second, the trial court must determine whether the accused, rather than the authorities, initiated further discussions or meetings with the police.  Third, if the accused did initiate further discussions or conversations with police, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel.

52 Va. App. at 335-36, 663 S.E.2d at 510 (citing Giles v. Commonwealth, 28 Va. App. 527, 532, 507 S.E.2d 102, 105 (1998)).

This prophylactic rule reflects "the underlying concern of Miranda, Edwards, and their progeny[:]  the coercive atmosphere of custodial interrogation and the state of mind of the suspect."  Commonwealth v. Gregory, 263 Va. 134, 147, 557 S.E.2d 715, 722 (2002).  The Miranda protections

> provide to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self-incrimination," are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of

- 5 -

> counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

Id. (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988)).  With all due respect to the learned majority, its holding fails to give appropriate deference to our case law's recognition of the coercive nature of custodial interrogations and the duty of law enforcement officers to *scrupulously honor* suspects' requests for counsel.  In this case, it is undisputed that appellant unequivocally invoked his right to counsel.  In my view, the evidence does not support the majority's analysis that appellant's request for counsel was scrupulously honored.[8]

Thus, Detective Alston's statement to Officer Papeo, which was made in appellant's presence, constituted a reinitiation of communication and an accusation that any reasonable person should have known was "reasonably likely to elicit an incriminating response from the suspect," and thus constituted the functional equivalent of an interrogation.  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Shortly after Officer Papeo told Detective Alston that appellant had invoked his right to counsel, the detective confronted appellant with the evidence against him.  He stated, "That's fine if he doesn't want to talk to me.  I wasn't the one who robbed the white lady and hit her in the head with a brick.  If that's the story you want to tell the judge, that's fine."  During cross-examination at the motion to suppress hearing, Detective Alston admitted that because appellant was in the room, *the statement was directed at appellant*, as well as Officer Papeo.

---

[8] More precisely stated, the Supreme Court held in Miranda that procedural safeguards must be employed to ensure the *right of silence* "will be scrupulously honored."  384 U.S. at 478-79.  To date, our courts have not explicitly stated that the right to counsel also must be "scrupulous honored"; however, in my opinion, when a suspect's right to counsel is given anything less than total deference, "the privilege of self-incrimination is jeopardized," see id. at 478.  Accordingly, it is appropriate to give, at a minimum, the right to counsel the same constitutional reverence given to the right of silence.

Immediately after Detective Alston directly invited appellant to reconsider his decision to exercise his constitutional right, appellant told the officers that he wished to talk to them and that he waived his right to counsel.

To determine whether Detective Alston's statement was an unconstitutional interrogation, we must determine "whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response." Timbers v. Commonwealth, 28 Va. App. 187, 196, 503 S.E.2d 233, 238 (1998). Because this is a question of law, we review it *de novo*. See id. at 193-94, 503 S.E.2d at 236 (holding that whether the appellant was subjected to a custodial interrogation is reviewed *de novo* (citations omitted)). "'If a [suspect's] statement is not foreseeable, then it is volunteered.'" Gates v. Commonwealth, 30 Va. App. 352, 356, 516 S.E.2d 731, 733 (1999) (quoting Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988)). By saying, "I wasn't the person that robbed a white lady and hit her in the head with a brick," Alston told appellant the evidence against him, using the specific terminology provided by appellant's co-defendant. The detective identified the victim in the case as the "white lady," after hearing co-defendant confess that appellant and co-defendant's plan was to "rob a white lady or white people in the VCU area." The second half of Detective Alston's statement, "If that's the story *you* want to tell the judge, that's fine," (emphasis added), was clearly addressed to appellant, and explicitly challenged his ability to exculpate himself. These statements do not fall into the category of appropriate statements made "normally attendant to arrest and custody." Innis, 446 U.S. at 301. Objectively, Detective Alston's statements amount to a warning that the police had co-defendant's confession, and unless appellant made a statement, the judge would look unfavorably upon appellant, based on co-defendant's confession. Detective Alston should have known that this criticism of appellant's defense would elicit a response.

The majority relies on Innis, 446 U.S. 291, to support its conclusion that "the conversation between Alston and Papeo was nothing more than a few offhand remarks between the two officers to which no response from Quarles was invited." In Innis, during a conversation between the police officers, one officer expressed concern about the location of a missing firearm used in the crime because the crime had occurred near a school for handicapped children. Id. at 294-95. The Supreme Court held that the conversation between the officers did not constitute express questioning because "no response from the respondent was invited." Id. at 302. Unlike the statement in Innis, Detective Alston's comments invited a response from appellant. Detective Alston said, "If that's the story you want to tell the judge, that's fine." The majority determines that this statement did not invite a response from appellant because it was ostensibly directed to Officer Papeo. The evidence does not support this determination because the detective's choice of the pronoun "you" indicates that he was speaking to appellant. If Detective Alston directed his comments solely to Officer Papeo, he would have chosen the pronoun "he," rather than "you." Additionally, during the motion to suppress, Detective Alston admitted that he directed his statements, at least in part, to appellant. Therefore, unlike the police officer's comments in Innis, the comments made by Detective Alston in this case clearly invited a response from appellant.

Based on the foregoing, I would find appellant's subsequent waiver of his Miranda rights invalid. Because appellant did not reinitiate communication with Detective Alston, his subsequent waiver of his right to counsel did not make his incriminating statements admissible.

> Once an accused asserts his or her right to counsel, subsequent waiver of that right is not sufficient to make admissible any incriminating statements thereafter obtained, even if investigators have re-Mirandized the accused, unless the statements are initiated by the defendant and shown to be based on a knowing, intelligent, and voluntary waiver.

<u>Giles</u>, 28 Va. App. at 531, 507 S.E.2d at 105. Since Detective Alston reinitiated communication with appellant after appellant unequivocally requested the assistance of counsel, appellant's subsequent waiver of his <u>Miranda</u> rights was not voluntary. Thus, his subsequent incriminating statements were inadmissible. Therefore, I would find the trial court erred in denying appellant's motion to suppress his incriminating statements.

There is no doubt that reasonable minds on a higher court could at some point question the continued viability of <u>Miranda</u> and its progeny. The facts and circumstances that dictate what is or is not a constitutional violation have over time become a more elusive target to identify. However, until controlling authority dictates a different result, it is my view that we are duty-bound to uphold the constitutional prerogatives criminal defendants still enjoy under <u>Miranda</u>, <u>Edwards</u>, <u>Roberson,</u> <u>Gregory</u>, and <u>Giles</u>.

For the foregoing reasons, I respectfully dissent from the majority's opinion in this case.