# IN THE SUPREME COURT OF IOWA

No. 19–0911

Submitted October 12, 2022—Filed March 24, 2023

**STATE OF IOWA,**

Appellee,

vs.

**ANTHONY ALEXANDER MONG,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, William P. Kelly, Judge.

The State seeks further review of the court of appeals decision reversing the defendant's convictions for attempted murder, intimidation with a dangerous weapon, and willful injury. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

McDonald, J., delivered the opinion of the court, in which all participating justices joined. May, J., took no part in the consideration or decision of this case.

Cathleen J. Siebrecht of Siebrecht Law Firm, Des Moines, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

**McDONALD, Justice.**

Anthony Mong shot at and attempted to kill Ricco Martin, but he missed and inadvertently shot and injured Shane Woods. Under Iowa law, "[a] party is liable for a wrongful act, where there exists a criminal intent," notwithstanding that the act done "is not that which was intended." *State v. Ruhl*, 8 Iowa (Clarke) 447, 448 (1859). "The wrongful intent to do one act, is transposed to the other, and constitutes the same offense." *Id.* The transposition of the defendant's criminal intent to establish criminal liability is known as the doctrine of transferred intent. Based on transferred intent, a jury found Mong guilty of the attempted murder of Woods, intimidation with a dangerous weapon with respect to Woods, willful injury causing bodily injury with respect to Woods, and going armed with intent.

The district court entered judgment and sentence following the jury's verdict, and Mong timely appealed his convictions. We transferred Mong's appeal to the court of appeals. The court of appeals concluded there was insufficient evidence Mong had the intent to kill or injure Woods to support the convictions for attempted murder, intimidation with a dangerous weapon, and willful injury; the court of appeals thus reversed those convictions. The court of appeals conditionally affirmed Mong's conviction for going armed with intent and remanded the matter to the district court to afford Mong an additional opportunity to develop a fair-cross-section challenge to the jury pool.

We granted the State's application for further review. "On further review, we have the discretion to review any issue raised on appeal." *State v. Crawford,*

972 N.W.2d 189, 203 (Iowa 2022) (quoting *State v. Vandermark*, 965 N.W.2d 888, 891 (Iowa 2021)). We exercise that discretion to review only those portions of the court of appeals decision regarding the jury selection process and the sufficiency of the evidence supporting Mong's convictions. The court of appeals decision is final as to all other issues.

I.

Mong and Madison Cobb began dating in 2017. The relationship was rocky because, among other things, Mong suspected Cobb was also involved in a relationship with Ricco Martin. Mong confronted Martin about Martin's relationship with Cobb. In 2017, Mong sent Martin thirty to forty intimidating text messages. In addition, several of the State's witnesses testified Mong was jealous of Martin and had threatened him. They testified Mong told Martin that "he didn't want to fight anymore, that he was just going to shoot him."

The shooting at issue in this case occurred several days after Cobb ended her relationship with Mong. Cobb lived with her parents Todd and Heather Hines. On the night of June 1, 2018, Cobb, Todd, Shane Woods (Cobb's uncle), David Woods (Cobb's cousin), and Martin were gathered in front of the Hines' residence. Around 8:00 p.m., Mong drove past the residence, made a U-turn, then parked on the street in front of the home. The State and Mong agree on these facts, but they disagree on what happened next.

According to the State, Mong shot at Martin, missed, and hit Shane. Todd testified that when Mong drove by the house, Todd heard the sound of someone racking a gun. Upon hearing the sound, Todd went inside to get his gun. When

Todd came back outside, he saw a gun in Mong's hand. Todd drew his gun, accidentally dropped it, and then ran into his home. Todd testified that between the time he dropped his gun and the time he ran inside, he heard, but did not see, two shots fired. Todd yelled at Shane to get in the house. Shane, still standing in the driveway, yelled, "I'm hit. I'm hit." And he was. A bullet entered the left side of his back, exited through his chest, and then went through his arm. At the time Shane was hit, he was six to eight feet from Martin. At trial, Shane identified Mong as the shooter. Martin testified that he saw Mong shoot Shane. During the confrontation, David retrieved a baseball bat from the garage. When David exited the garage, he saw Shane bleeding. David also saw Mong get into his car. David chased Mong's car with the baseball bat as it drove away. Todd called 911, and Shane was later transported to the hospital and treated for the gunshot wound. Police later found a shell casing in the street where Mong would have been.

According to Mong, he was the victim in this incident. Mong testified he and his best friend, Brandon Henlon, went to the Hines' residence to retrieve Mong's Cadillac, which Todd had been working on. Mong testified he arrived at the house, parked in the street, told Henlon to stay in the car, and exited the vehicle with a black iPhone in his hand. Mong testified he never had a gun with him. Mong testified that, as he crossed the sidewalk, he noticed Todd had a gun. Mong testified that Martin started "going for the firearm." Mong testified that when he saw Martin reach for Todd's gun, Mong ducked behind a big tree in the yard to avoid being shot. Mong testified he heard the sound of a shot from where

the group was standing and then the sound of another shot from behind him. Mong testified he did not see who fired either shot. He testified he ran back to his vehicle. When he got in the vehicle, Henlon had a gun in his hand. Mong testified that until that point, he did not know Henlon had a gun. Henlon died of a drug overdose prior to trial and was unable to testify about these events.

After the shooting, Mong drove away from the scene. He testified he dropped the car off at a friend's house. When police later found the car, they discovered in it "a live round shell casing with a bullet that had not been fired yet." Rather than returning home or contacting the police, Mong went on the run. He testified he did so because he was afraid of being shot. He testified he stayed that night at a local hotel, which his friend Raymond had booked for him. When asked Raymond's last name, Mong responded he "was not sure of his last name." Mong testified that Raymond, whose last name Mong did not know, then drove him to Las Vegas. Mong testified that his mother lived in Las Vegas, that "she was sick," and that he "needed to see her." He testified that he did not contact the police to report Henlon because Henlon was his best friend and that he did not want to get Henlon in trouble. In August 2018, police arrested Mong in Las Vegas. He was then returned to Iowa to face the charges at issue here.

The State charged Mong with the attempted murder of Shane Woods, in violation of Iowa Code section 707.11(1) (2018); intimidation of Shane Woods with a dangerous weapon, in violation of Iowa Code section 708.6; felon in possession of a firearm, in violation of Iowa Code section 724.26(1); willful injury causing serious injury to Shane Woods, in violation of Iowa Code

section 708.4(1); and going armed with intent, in violation of Iowa Code section 708.8. The State also pursued a sentencing enhancement under Iowa Code section 902.7, which required the district court to impose a mandatory minimum sentence upon a finding that Mong used a dangerous weapon during the commission of a forcible felony. At the beginning of trial, the State dismissed the charge of felon in possession of a firearm.

The party's respective theories of the case were presented clearly to the jury. The State's theory was one of transferred intent: Mong attempted to shoot Martin, missed Martin, and inadvertently shot and injured Shane. The district court instructed the jury on this theory. The prosecutor clearly explained the theory and the instruction to the jury during closing argument:

> [T]here is what is called "transferred intent." Read it. It means you become liable. So if your intent is against A and you hit B, you get prosecuted for hitting B. That's the law. Not because [I] said it, but you have an instruction that says that.

Mong's theory of the case did not challenge transferred intent but instead challenged the underlying conduct. Indeed, he agreed with the prosecutor on the transferred intent issue. His counsel explained as much during closing argument:

> [Y]ou're going to see in many different places in your marshaling instructions that Defendant specifically intended to cause the death of Shane Woods as one of the elements. And you all know that hasn't been shown. Every time you see that, you know there wasn't the specific intent to do anything to Shane Woods.
>
> . . . .
>
> So it has to be Ricco Martin, ladies and gentlemen. It has to be Ricco Martin under the "transferred intent" theory, that there was

a specific intent. There's just not enough evidence. The evidence, ladies and gentlemen, shows the specific intent to hide.

On this point, Mong wholly denied he was in possession of a gun or shot at anyone. As his counsel put it, "What we are denying is that my client had a gun that day. And we are denying that my client shot a gun that day." Mong argued Woods was shot by Henlon or accidentally by Todd.

The jury resolved this factual dispute in favor of the State. The jury found Mong guilty of the attempted murder of Woods, intimidation of Woods with a dangerous weapon, and going armed with intent. With respect to each charge, the jury answered a special interrogatory related to the sentencing enhancement and found Mong "was in the immediate possession and control of a dangerous weapon, displayed a dangerous weapon in a threatening manner or was armed with a dangerous weapon." The jury acquitted Mong of willful injury causing serious injury but found him guilty of the lesser included offense of willful injury causing bodily injury.

## II.

We first address Mong's challenge to the jury selection process. The Sixth Amendment to the United States Constitution guarantees the right to "an impartial jury of the state and district wherein the crime shall have been committed." U.S. Const. amend VI. The Iowa Constitution guarantees the right to a "trial by an impartial jury." Iowa Const. art. I, § 10. The United States Supreme Court and this court have held the constitutional right to "an impartial jury" includes the right to a jury "drawn from a fair cross-section of the

community." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975); *State v. Plain*, 898 N.W.2d 801, 821 (Iowa 2017).

Under controlling precedents, a defendant establishes a prima facie violation of the fair-cross-section right by proving the following: (1) a group alleged to have been excluded from the jury pool is a distinctive group in the community; (2) the distinctive group's representation in the jury pool is not "fair and reasonable" when compared to the group's percentage in the community; and (3) the distinctive group's underrepresentation in the jury pool "is due to systematic exclusion of the group in the jury-selection process." *Plain*, 898 N.W.2d at 822 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). The defendant has the burden of proving a violation of his fair-cross-section right. *Id.* at 821–22. The "inability to establish any one of the three . . . elements is fatal to a defendant's fair-cross-section challenge." *State v. Williams*, 972 N.W.2d 720, 724 (Iowa 2022).

During trial Mong initially raised a challenge to the composition of the jury panel. He noted that only one of forty jurors on the panel was African-American and that this underrepresented the African-American population in the county. Mong argued that "we need to have an appropriate level of African-Americans represented within this panel." He requested as a remedy that the district court "include additional African-American jurors, specifically on this panel" or "[p]ick a new panel." The district court denied Mong's challenge to the jury panel.

The district court did not err in denying Mong's fair-cross-section challenge to the jury panel. Our cases recognize the fair-cross-section right

extends only "to the jury pool" and not to the jury panel or the petit jury. *State v. Wilson*, 941 N.W.2d 579, 593 (Iowa 2020). "The jury *pool* refers to members of the community summoned for jury duty and reporting to the courthouse for a particular time period. The jury *panel* refers to members of the pool directed to a particular courtroom after they arrive at the courthouse to serve as possible jurors for a specific trial." *State v. Plain*, 969 N.W.2d 293, 294–95 (Iowa 2022) (citation omitted). The petit jury "refers to the group actually selected for a specific trial and generally given the power to decide questions of fact and return a verdict in the case." *Id.* at 295. We decline Mong's request to extend our fair-cross-section jurisprudence to challenges to the jury panel.

Although Mong's initial challenge was to the jury panel, he later raised a challenge to the jury pool. After the district court denied Mong's challenge to the jury panel, the district court stated it would provide Mong with biographical information regarding the jury pool and provide Mong the opportunity to present additional evidence to support a fair-cross-section challenge to the jury pool. The district court directed the jury clerk to provide Mong with the relevant biographical information. Mong was given the opportunity to review the information. The next day, Mong reported that five percent of the jury pool was African-American compared to seven percent of the population in the county. When the district court asked whether Mong had "evidence in regards to systematic exclusion," Mong's counsel replied, "Nothing other than what we've already discussed yesterday . . . with respect to our argument." In the absence

of evidence, the district court found Mong failed to prove systematic exclusion and denied Mong's jury pool challenge.

The district court correctly denied Mong's challenge to the jury pool. Mong had the burden of production and persuasion in establishing a prima facie violation of his fair-cross-section right. *See Plain,* 898 N.W.2d at 821–22. To prove systematic exclusion, Mong was required to produce evidence that any alleged "underrepresentation resulted from a particular feature (or features) of the jury selection system." *Williams,* 972 N.W.2d at 724. Proof that underrepresentation resulted from a particular feature or features of the jury selection system will "almost always require expert testimony to (1) identify 'the precise point of the juror summoning and qualification process in which members of distinctive groups were excluded from the jury pool' and (2) offer 'a plausible explanation of how the operation of the jury system resulted in their exclusion.' " *State v. Lilly* (*Lilly II*), 969 N.W.2d 794, 799 (Iowa 2022) (quoting *State v. Lilly* (*Lilly I*), 930 N.W.2d 293, 307 (Iowa 2019)).

Mong failed to meet his evidentiary burden to prove systematic exclusion. Mong "called no expert witness whatsoever, let alone one that pinpointed the procedural step in which African-Americans were excluded and offered a plausible explanation for how the summoning and qualification process brought it about." *Lilly II,* 969 N.W.2d at 799. When the district court asked for evidence in support of the claim, Mong's counsel responded, "I don't have evidence of that." Instead, counsel argued systematic exclusion is difficult to prove and "is an unfair test." Even on appeal, Mong does not identify the precise feature or

features in the jury-selection process that allegedly resulted in systematic exclusion. Instead, he argues the alleged disparity between African-Americans in the jury pool and the general population is sufficient, in and of itself, to establish systematic exclusion. We disagree. Mong's failure to present evidence defeats his fair-cross-section claim. *See Williams*, 972 N.W.2d at 724–25; *Lilly I*, 930 N.W.2d at 307 ("Mere speculation about the possible causes of underrepresentation will not substitute for a credible showing of evidence supporting those allegations." (quoting Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must Be Expanded*, 59 Drake L. Rev. 761, 790–91 (2011))).

III.

We next address the sufficiency of the evidence supporting Mong's convictions. "This court reviews sufficiency of evidence claims for the correction of errors at law." *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)).

A.

The doctrine of transferred intent is well established in Iowa. Only several years after the Iowa Constitution was adopted, this court explained that "[t]he wrong intended, but not done, and the wrong done, but not intended, coalesce, and together constitute the same offense." *Ruhl*, 8 Iowa at 451 (quoting Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 254, at 233 (1st ed. 1856)). In a later case, a defendant was charged with murder after she fired a revolver at her intended target, missed her intended target, and inadvertently killed the target's wife. *State v. Huston*, 174 N.W. 641, 642 (Iowa 1919). This court affirmed the conviction, explaining criminal intent follows the bullet wherever it goes:

> The evidence is quite abundant to show that the defendant, with malice aforethought, did have specific intent to kill Charles Davis. This was her malice and this her intent. The malice and intent which started the bullet is deemed in law to have followed it wherever it went. The fact that the bullet hit an unintended mark will not excuse the malice and intent that started it. The killing of Clora Davis by this bullet being shown, it was enough to show that the defendant fired it with malice aforethought and a specific intent to kill Charles Davis. There was therefore no lack of proof of the elements of the crime of murder in the second degree.

*Id.* (citation omitted).

Iowa's courts have repeatedly applied the doctrine of transferred intent to impose liability where a criminal defendant acts with intent to kill or harm one person but inadvertently kills or harms an unintended person. *See, e.g., State v. Harlow*, No. 15–1322, 2016 WL 4384690, at *1 (Iowa Ct. App. Aug. 17, 2016) (affirming conviction for assault on baby where defendant intended to assault mother and accidentally struck baby and gave baby black eye); *State v. Seats*, No. 09–1687, 2010 WL 5050571, at *3 (Iowa Ct. App. Dec. 8, 2010) ("A

defendant's malice aforethought and specific intent toward the intended victim is relevant evidence to support a conviction of murder when an innocent bystander is the actual victim."); *Lewis v. State*, No. 07–0553, 2008 WL 141155, at *4 (Iowa Ct. App. Jan. 16, 2008) (affirming attempted murder conviction on aiding and abetting theory where defendant participated in drive-by shooting that missed intended target and injured another).

Most relevant here is the case of *State v. Alford*, in which this court affirmed a conviction for attempted murder assault. 151 N.W.2d 573, 574 (Iowa 1967), *overruled on other grounds by State v. Bester*, 167 N.W.2d 705 (Iowa 1969). In *Alford*, the defendant got into a fight with a man named Jerry Overton, and the "defendant got the worst of it." *Id.* After the fight, the licked defendant and his brother got in their car and drove away. *Id.* Five minutes later, the defendant returned with a gun. *Id.* The defendant fired a shot at Overton, missed, and inadvertently shot his brother, Richard, in the cheek and ear. *Id.* The defendant was convicted of assault with intent to commit murder with respect to Richard, the unintended but actual victim of the shooting. *Id.* This court rejected the defendant's contention that he lacked any intent toward Richard, explaining it was "not . . . necessary to prove the malice aforethought was directed toward the person actually shot." *Id.* We further explained, under the doctrine of transferred intent, there is no requirement "that the intent to commit murder be directed toward the person actually injured." *Id.*[1]

---

[1]We acknowledge that "[j]urisdictions are split over whether transferred intent can be applied in attempted murder cases." *State v. Geter*, 864 S.E.2d 569, 573 (S.C. Ct. App. 2021). Many jurisdictions, like Iowa, apply the doctrine of transferred intent in attempted murder cases

B.

With that background, we directly address Mong's challenge to his convictions for attempted murder, intimidation with a dangerous weapon, and willful injury causing bodily injury. Mong argues that the marshaling instructions for attempted murder, intimidation with a dangerous weapon, and willful injury required proof Mong intended to kill or injure Shane Woods and that there was no evidence he had any intent with respect to Shane Woods. Specifically, Instruction No. 17 for attempted murder required proof Mong "specifically intended to cause the death of Shane Woods." Instruction No. 23 for intimidation with a dangerous weapon required proof Mong "shot the dangerous weapon with the specific intent to injure or cause fear or anger in Shane Woods." Instruction No. 27 for willful injury required proof that Mong "specifically intended to cause a serious injury to Shane Woods."

Mong ignores that the district court specifically instructed the jury that Mong's intent to harm one victim transfers to and is "transposed to the other." Instruction No. 16 provided:

> Under the doctrine of transferred intent, once the intent to inflict harm on one victim is established, the criminal intent transfers to any other victim who is actually assaulted. A party is liable for a wrongful act, where there exists a criminal intent, although the act done, is not that which was intended. The wrongful

based on the public policy of punishing those with criminal intent. *See, e.g., State v. Rodriguez-Gonzales*, 790 P.2d 287, 288 (Ariz. Ct. App. 1990); *People v. Hill*, 658 N.E.2d 1294, 1297–98 (Ill. App. Ct. 1995); *Blanche v. State*, 690 N.E.2d 709, 712 (Ind. 1998); *State v. Thomas*, 53 So. 868, 869–70 (La. 1910); *State v. Ford*, 539 N.W.2d 214, 229 (Minn. 1995) (en banc); *Ochoa v. State*, 981 P.2d 1201, 1205 (Nev. 1999); *State v. Gillette*, 699 P.2d 626, 636 (N.M. Ct. App. 1985); *State v. Dean*, 54 N.E.3d 80, 116 (Ohio 2015). Other jurisdictions disallow it. *See Geter*, 864 S.E.2d at 573–75 (discussing issue and cases); *Cockrell v. State*, 890 So. 2d 174, 176–81 (Ala. 2004) (discussing issue and cases). Mong has not questioned the application of the transferred intent doctrine to inchoate crimes, including attempted murder.

intent to do one act, is transposed to the other, and constitutes the same offense.

The word "transpose" means "to change the relative place or normal order of" two or more things. *Transpose, Merriam-Webster's Collegiate Dictionary* (10th ed. 2002). As instructed here, Martin and Woods are interchangeable, and proof of intent to kill or injure Martin is proof of intent to kill or injure Shane Woods. *See Blow v. Commonwealth*, 665 S.E.2d 254, 258 (Va. Ct. App. 2008) ("The doctrine of transferred intent permits a fact finder to transpose a defendant's criminal intent to harm an intended victim to another unintended, but harmed, victim.").

With that understanding, when the evidence is viewed in the light most favorable to the jury's verdict, there is substantial evidence Mong specifically intended to cause the death of and/or injure Martin and, by transposition, Shane Woods. Mong and Cobb were in an on-again, off-again relationship. Mong was jealous of Cobb's relationship with Martin. Mong sent thirty to forty threatening text messages to Martin. *See, e.g., State v. Troutman*, No. 17–0277, 2018 WL 1182623, at *3 (Iowa Ct. App. Mar. 7, 2018) (explaining threatening text messages were, among other things, substantial evidence of intent to support first-degree murder conviction). In the days leading up to the shooting, Mong told Martin that he "was going to shoot him." *See, e.g., State v. Burton*, No. 19–1754, 2021 WL 2453365, at *15 (Iowa Ct. App. June 16, 2021) (concluding statement "bitch I'll shoot you" was substantial evidence in support of murder conviction). After the shooting, Mong left for Las Vegas with no notice and no apparent intent to return despite having a full-time job and dependents in Iowa. *See, e.g., State v. Marsh*, 392 N.W.2d 132, 134 (Iowa 1986) (stating

evidence of flight may be introduced at trial and used by counsel in argument as evidence of consciousness of guilt); *State v. Wimbush*, 150 N.W.2d 653, 656 (Iowa 1967) (noting "[m]any acts of a defendant after the crime seeking to escape the toils of the law are received as admissions by conduct, constituting circumstantial evidence of consciousness of guilt" such as flight (quoting Charles T. McCormick, *McCormick on Evidence* § 248, at 532–33 (1st ed. 1954))).

Most important, Mong arrived at the Hines's residence without provocation and fired at least one shot in Martin's direction. In the special interrogatories, the jury specifically found Mong "was in the immediate possession and control of a dangerous weapon, displayed a dangerous weapon in a threatening manner or was armed with a dangerous weapon." "[T]he general rule is that one who arms himself with the express purpose of shooting another cannot ordinarily claim the elements of" murder or attempted murder are lacking. *State v. Smith*, 240 N.W.2d 693, 695 (Iowa 1976); *see State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017) (stating a "rational juror could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill"); *State v. Clarke*, 475 N.W.2d 193, 197 (Iowa 1991) (holding that firing two shots at someone was substantial evidence of intent sufficient to support convictions for attempted murder and willful injury); *State v. Mart*, 20 N.W.2d 63, 66 (Iowa 1945) ("We have held repeatedly that an intent to kill may be inferred from the use of a deadly weapon in a deadly manner. Such intent may be thus inferred though the wound inflicted does not prove fatal." (citation omitted)).

## C.

Mong raises an additional challenge to the sufficiency of the evidence supporting his conviction for intimidation with a dangerous weapon. With respect to this charge, the jury was instructed the State had to prove: (1) Mong "intentionally shot a dangerous weapon within an assembly of people"; (2) "Shane Woods actually experienced fear of serious injury and his fear was reasonable under the existing circumstances"; and (3) Mong "shot the dangerous weapon with the specific intent to injure or cause fear or anger in Shane Woods." Mong contends that there is no evidence Shane Woods actually experienced fear.

We agree this element was not supported by substantial evidence even when the evidence is viewed in the light most favorable to the jury's verdict. Shane testified he had "no problems with [Mong] at all." When Mong arrived and approached the group, Shane saw the gun. Shane testified:

> I turned around again. I didn't run because I wasn't too worried. I had no beef with him. I didn't think I had a problem. So I just turned around to walk back up towards the house and heard a shot, and it hit me on the left side of my back. It come out of my arm.

Shane's testimony showed he did not experience fear.

The doctrine of transferred intent does not resolve the situation. The doctrine of transferred intent transfers or transposes the defendant's criminal intent to harm person *A* to the unintended but actual victim, person *B*. The transferred intent doctrine does not transfer or transpose the intended victim person *A*'s state of mind or alleged state of mind to the unintended but actual victim, person *B*. Shane Woods testified he was not too worried upon seeing Mong

with a weapon. He did not actually experience fear of serious injury. This conviction must be reversed due to insufficient evidence.

## IV.

For the foregoing reasons, we affirm Mong's convictions for attempted murder, willful injury causing bodily injury, and going armed with intent. We vacate the judgment of conviction and sentence for the charge of intimidation with a dangerous weapon and remand to the district court for dismissal of that charge.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**